## UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| JOSHUA F. YOUNG, | |
| Plaintiff, | |
| v. | No. _____ |
| COLORADO DEPARTMENT OF CORRECTIONS; DEAN WILLIAMS; and JILL HUNSAKER RYAN, | |
| Defendants. | **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Pursuant to F.R.C.P. 15(a)(2), Plaintiff submits the following First Amended Complaint for Declaratory and Injunctive Relief. ECF 13, at 2 ("The parties are stipulating to a short extension of time for Defendants to respond to Plaintiff's Complaint for the purpose of allowing Plaintiff the opportunity to first file an amended complaint."). Pursuant to D.C.COLO.LCivR 15.1(a), a copy of this Complaint which strikes through the text to be deleted and underlines the text to be added is attached hereto as Exhibit 12.

Plaintiff Joshua F. Young was a rising star at the Colorado Department of Corrections. He was one of the first employees promoted from his graduating class, advancing to the role of Corrections Officer at Limon Correctional Facility in 2017. Shortly after, in 2019, he served as a Housing Sergeant in a close custody unit, running one of the most difficult prison units in the State of Colorado. In 2020, he began serving as a Visiting Sergeant, a position in which he screened visitors and ensured the safety of both visitors and prisoners during visitation periods. In short, his job depended on making good decisions and not treating situations, inmates, or visitors differently on the basis of their race.

Unfortunately, the Colorado Department of Corrections had different ideas. Its official and mandatory training insisted that all whites are racist, that they perpetuate white supremacy, that the very notion of race was invented by white people to justify the oppression of people of color, that white supremacy is an ever-present feature of daily life in the United States, and that whites who deny their own racism are merely "fragile" racists who cannot accept their own prejudice. Indeed, the Colorado prison system's forced training seemed to want its employees to internalize these messages to the detriment of prison safety, and to create a culture of distrust among its hard-working officers.

As a result, Mr. Young was subjected to hostile work environment discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et. seq. The official training materials for the Colorado Department of Corrections—provided by the State of Colorado by the Colorado Department of Public Health & Environment under the auspices of "Equity, Diversity, and Inclusion" training—created working conditions that were so severe and pervasive as to discriminate against Young on the basis of his race. Indeed, these effects have been so severe and pervasive that they altered the terms of his working conditions and ultimately forced him to resign.

Additionally, Defendants violated Mr. Young's right to equal protection under the Fourteenth Amendment of the U.S. Constitution by engaging in state action motivated by race with a discriminatory purpose, classifying him and others by race, and stereotyping him and others on the basis of race. *Lawrence v. Texas*, 539 U.S. 558, 600 (2003) (Scalia, J., dissenting) ("A racially discriminatory purpose is always sufficient to subject a law to strict scrutiny, even a facially neutral law that makes no mention of race.").

## INTRODUCTION

1.     Equal protection under the law is the cornerstone of modern-day American constitutional jurisprudence. It was "[p]urchased at the price of immeasurable human suffering." *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 240 (1995) (Thomas, J., concurring in part and concurring in judgment).

2.     The U.S. Constitution "forbids" governmental discrimination "against any citizen because of his race." *Id.* at 216 (internal citations omitted).

3.     "Classifications of citizens solely on the basis of race are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality. They threaten to stigmatize individuals by reason of their membership in a racial group and to incite racial hostility." *Shaw v. Reno*, 509 U.S. 630, 643 (1993); *Regents of the Univ. of California v. Bakke*, 438 U.S. 265, 307 (1978) (opinion of Powell, J.) ("Preferring members of any one group for no reason other than race or ethnic origin is discrimination for its own sake. This the Constitution forbids.").

4.     However, the Colorado Department of Corrections implemented mandatory trainings that made sweeping negative generalizations regarding individuals who are white, and other gross generalizations about members of other racial demographics.

5.     "Title VII of the Civil Rights Act of 1964 makes it 'an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting 42 U.S.C. § 2000-e(a)(1)).

6.      Moreover, "[u]nder Title VII, a plaintiff can prove discrimination in several different ways, including proof of a hostile work environment or disparate treatment." *Throupe v. Univ. of Denver*, 988 F.3d 1243, 1251 (10th Cir. 2021).

7.      The Colorado Department of Corrections' mandatory trainings created a racially hostile environment for Mr. Young. These trainings forced Mr. Young to hear and absorb statements that were facially based on race. The trainings' sweeping generalizations about white individuals were not merely boorish, juvenile, or annoying comments. Rather, the statements and their mandatory, recurring nature indicated that the workplace is permeated with discrimination, ridicule, and insult.

8.      Accordingly, Mr. Young brings this lawsuit under Title VII of the Civil Rights Act of 1964 against Defendant Colorado Department of Corrections for developing and implementing training materials and training sessions that severely altered his conditions of employment such that they created a racially hostile and abusive work environment.

9.      Additionally, the training materials themselves were developed and used with the imprimatur of the State of Colorado. State actors may not develop and implement racially discriminatory programs, or encourage or demand that state employees engage in training that is racially discriminatory, consistent with the U.S. Constitution. *See Loving v. Virginia*, 388 U.S. 1, 10 (1967) ("The clear and central purpose of the Fourteenth Amendment was to eliminate all official state sources of invidious racial discrimination in the States."). Mr. Young therefore brings this action against Defendants Williams and Hunsaker Ryan in their official capacities, to obtain prospective relief, and prevent them from developing or using discriminatory training materials for Colorado state employees.

## PARTIES

10.     Plaintiff Joshua F. Young resides in Colorado Springs, in the District of Colorado.

11.     Defendant Colorado Department of Corrections is the principal department of the Colorado state government that operates the state prisons.

12.     Defendant Dean Williams is the Executive Director of the Colorado Department of Corrections.

13.     Defendant Jill Hunsaker Ryan is the Executive Director of the Colorado Department of Public Health & Environment, which created and/or promulgated some or all of the training materials used by the Colorado Department of Corrections.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this complaint under 28 U.S.C. §§ 1331 and 1343 because this case presents a substantial question of federal law, specifically whether Defendants' discriminatory training materials created a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et. seq., and violated the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

15.     This Court has authority to issue a declaratory judgment and to order injunctive relief and other relief that is necessary and proper pursuant to 28 U.S.C. §§ 2201 and 2202.

16.     Venue is appropriate in this district under 28 U.S.C. § 1391.  A substantial part of the events giving rise to this claim occurred in this district, and Defendants maintain one or more offices and employees in this district.

## Mr. Young Has a Right to be Free from Workplace Harassment

17.     As an employee in the United States, Mr. Young possesses certain protected civil rights and expectations. Of particular importance here, Mr. Young has a right to be free from harassment at his workplace: "[a]lthough hostile work environment is not explicitly mentioned in Title VII, it is well established a victim of a racially hostile or abusive work environment may bring a cause of action pursuant to 42 U.S.C. § 2000e-2(a)(1)." *Bolden v. PRC, Inc.*, 43 F.3d 545, 550 (10th Cir. 1994).

18.     "Proof of either severity or pervasiveness can serve as an independent ground to sustain a hostile work environment claim." *Throupe*, 988 F.3d at 1252 (citing *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1222 (10th Cir. 2015)).

19.     Further, in determining whether harassment has occurred, courts look at the "totality of the circumstances" and "consider[] such factors as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Morris*, 666 F.3d at 664 (quoting *Chavez v. New Mexico*, 397 F.3d 826, 832-33 (10th Cir. 2005) (internal quotations omitted). "[T]hat [objective] inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998). "Conduct which is considered normal and appropriate in one setting may be deemed abusive or hostile in another." *Morris*, 666 F.3d at 664 (quoting *EEOC v. Fairbrook Med. Clinic, PA*, 609 F.3d 320, 328 (4th Cir. 2010)).

20.     Far from an educational setting like an upper-level university sociology course—where provocative thoughts and ideas are acceptable due to their ability to challenge individuals and force them to consider different perspectives—the workplace is no place to experiment with

overtly racial policies and teachings. This is particularly true in the prison context, where racial tensions already run high, and every day may bring a life-or-death situation. Yet that is exactly what Defendants have done by introducing destructive and discriminatory mandatory training courses to which all employees must be subjected. As is explained in detail below, the teachings which were forced upon Mr. Young were so severe and pervasive that no reasonable person would find them acceptable in the workforce.

**Defendants' Discriminatory Trainings Are So Severe and Pervasive That Mr. Young Was Forced to Resign from His Position**

21.     Defendants' mandatory trainings paint a grim picture of the United States as a racist country permeated with discrimination, ridicule, and insult that trickle down to all aspects of American society, including the workplace.

22.     For instance, Mr. Young's training materials were based upon a glossary of terms stating that all whites are racist, that white individuals created the concept of race in order to justify the oppression of people of color, and that "whiteness" and "white supremacy" affect all "people of color within a U.S. context."

23.     The glossary also states that white individuals are triggered by feelings of guilt and fear when confronted with "information about racial inequality and injustice."  This phenomenon is referred to as "white fragility" in the state-provided training glossary.

24.     Specifically, the following definitions are to be used as background information for the training:

(a)     "BIPOC": "Acronym for Black, Indigenous People, and People of Color; the term is used to acknowledge that Indigenous and Black people have been most impacted by whiteness, both historically and in the present day. This shapes the experiences

of and <u>relationship to white supremacy for all people of color</u> within a U.S. context." Exhibit 1 (Glossary of Equity Terms), at 2–3.

(b)     "White Fragility": "Discomfort and defensiveness, often <u>triggered by</u> feelings of fear or <u>guilt</u>, <u>on the part of a white person</u> when confronted by information about racial inequality and injustice." *Id.* at 14.

(c)     "Race": "A social construct that artificially groups people by skin tone and other physical traits. The concept, which has no genetic or scientific basis, <u>was created and used to justify social and economic oppression of people of color by white people</u>." *Id.* at 10 (emphasis added).

(d)     "White Exceptionalism": "The belief held by some white allies that <u>they are the exception to white racism</u> even though they fail to address the implicit ways in which <u>they perpetuate white supremacy</u>. These individuals are often more interested in not seeming racist than actually improving the lives of people of color. This is sometimes referred to as fakequity." *Id.* at 14.

(emphasis added).

25.     Defendants' state-sanctioned training, in other words, implies a direct relationship between "whiteness" and "white supremacy," which it contends presently affects all people of color in the United States.

26.     It is thus clear why Mr. Young would feel intimidated and harassed—his own employer is equating the color of his skin with adherence to racist principles, imputing that Mr. Young promotes racist principles merely by dint of the color of his skin. These brazen teachings

are "both subjectively and objectively hostile or abusive." *Lounds*, 812 F.3d at 1222 (quoting *MacKenzie v. City and Cty. Of Denver*, 414 F.3d 1266, 1280 (10th Cir. 2005)).

27.     In the same vein, it is hard to fathom the level of outrage that would be directed towards Defendants if the trainings had included a definition of "Jewish Fragility" as "discomfort and defensiveness, often triggered by feelings of guilt, on the part of a Jewish person when confronted by information about wealth inequality." Such obviously anti-Semitic statements would have no place in an any employer's training, much less a state-sponsored training program.

28.     Such hostile and abusive language is abhorrent, regardless of the recipient's race, and has no place in the work environment. At the very least, such language would negatively affect the employee's job performance and overall sentiment of his or her employer. *See Harris*, 510 U.S. at 22 ("A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality.").

29.     Defendants' training also included a section on "Other Tools & Resources" that employees were to watch and read. *See* Exhibit 2. Mr. Young felt pressure to review these materials and indeed did review many of them. He also felt that because the mandatory trainings insufficiently explained why, for instance, his skin color caused him to be a racist or oppressor, that the additional materials might offer additional relevant information.

30.     But unfortunately, these "resources" also contained troubling and racist statements.

31.     For instance, in *Redlined, A Legacy of Housing Discrimination*, one of the interviewees uses the full N-word, placing it in the voice of all individuals other than African-Americans.[1] (Timestamp 3:10) ("The concept of a middle-class black only exists in the mind of a middle class black. Everywhere else in the suburbs, you were that [N-word] family on the corner Warren Road and Boulevard Way.").

32.     The same video accuses all white individuals of misunderstanding that whatever success they had was a result of their own merit, as opposed to the simple product of past forms of race discrimination. *See id.* (Timestamp 3:31) ("Well the truth is that we've had in this country generations of affirmative action for whites, and the sad truth of it is that whites don't know that that's happened or they've refused to accept it, or don't understand the history. What that leads to is this false kind of narrative [for whites] that 'I did it myself,' you know this Horatio Alger, individual responsibility, narrative.") (emphasis added).

33.     Later, the video describes white individuals as having a misplaced sense of success. *See id.* (Timestamp 10:37) ("So many white Americans experience this sense of self-esteem, this sense of you know superiority if you will, this sense of mastery, that they have created their own destiny in their lives, and they have no acknowledgment of this invisible hand that supported them throughout their lives, and not just them, but there's a legacy of that invisible hand across generations, that has translated itself from the original affirmative action to trillions of dollars of 'head start' ahead of other communities like African-Americans, Latinos, Native Americans, others, who don't have the same benefit.") (emphasis added).

---

[1] https://siliconvalleyathome.org/redlining-new-video-from-the-200/

34.     No employer would dare include in their training the same statement, except with "white Americans" swapped with "Chinese Americans." Such a statement would clearly violate Title VII as workplace harassment and discrimination—as does Defendants' training.

35.     In addition to these wildly stereotypical statements that presume to know what all white individuals know and think, the recommended reading assignments contain outright support for forms of invidious race discrimination masquerading as "anti-racist" literature.

36.     Two recommended books are (1) White Fragility: Why It's So Hard for White People to Talk About Racism, by author Robin DiAngelo; and (2) How to be an Antiracist, by author Ibram X. Kendi. These books entrench invidious racial stereotypes and, in certain contexts, their use may violate Title VII, without more. Recently, the Montana Attorney General issued an opinion examining these books and their troubling racist sentiments. "White Fragility," for instance, assumes that all white individuals are racist, and that their defensiveness when informed of their racism is merely a part of their fragile identity. *See* Exhibit 3 (Letter to Elsie Arntzen, Superintendent of Public Instruction (May 27, 2021), at 15 (noting that the book claims that "White identity is inherently racist.")).[2]

37.     In the same letter, the Montana Attorney General observed that Kendi's book expressly endorses race discrimination:

> According to Kendi's How to Be an Antiracist, "[t]he only remedy to racist discrimination is antiracist discrimination. The only remedy to past discrimination is present discrimination … The only remedy to present discrimination is future discrimination." … Kendi's description is correct: antiracism demands race-based discrimination.

---

[2] (also available at: https://media.dojmt.gov/wp-content/uploads/AGO-V58-O1-5.27.21-FINAL.pdf)

*Id.* at 18–19. It is shocking that Colorado state employees would be trained to read and absorb material of this nature, and to be encouraged to support race discrimination.

38.     In another training video, called Intersectionality 101, animated Claymation figures are used to describe how racial identities are distinct, and force individuals to have different experiences as they go through life. A white woman named Greta is contrasted with two other individuals—Jerry and Fatima—as the video literally separates them by a physical divider, and states "Gretta, on the other hand, can ignore intersectionality if she wants to—another form of privilege."  Exhibit 4 (screenshot of YouTube video).

39.     Defendants' training also includes a host of links to other materials, including the State's official website for the Office of Health Equity. In addition to the materials above, the Office of Health Equity promulgated an "Equity Continuum," a document that comprised part of Mr. Young's training materials, which promotes "leveling the playing field" through overt racial discrimination. *See* Exhibit 5 (Equity Continuum). According to that document, to achieve equity, "Success is often defined by treating groups/people differently based on historic injustices and present-day barriers so everyone has the opportunity to thrive." *Id.* In other words, Defendants' training, promulgated by Defendants, advocates for treating people differently on the basis of race, in contravention of state and federal law. Imagine if Mr. Young actually applied this training in his workplace, to the detriment of prisoners, visitors, and his colleagues.

40.     At the same website is another document, entitled "Guidance for Leaders: Engaging in Racial Discussions." While Mr. Young's training was entirely computer based, the nature of the statements in this document indicates that the Department of Corrections' training is part of a pattern of explicit race discrimination by the state, which is training its leaders to anticipate

complaints by white employees. For instance, one section for leaders states: "How do I acknowledge that I have not experienced racism or have benefited from privilege, power?" Exhibit 6, at 2.

41. The response to the question states "It's as simple as acknowledging that your skin tone, education, role/status, etc. grants you opportunity, power, or privilege that others do not experience. Acknowledge that white norms in our communities and workplaces that can leave others feeling left out." Exhibit 6, at 2; *see id.* at 3 ("Expect defensiveness; Consider the idea of white fragility and how it might be influencing or thwarting the interaction.") (emphasis added).

42. Thus, the official policy of the State of Colorado is that one's racial makeup "grants" privilege and power, and that "white norms" leave people feeling left out of workplace training sessions.

43. Colorado's "Equity, Diversity, and Inclusion" website also includes training materials that label certain phrases of speech as "White Talk." Exhibit 7, at 5 (Facilitating Difficult Race Discussions) (emphasis added). Consistent with the glossary above, "White Talk" is speech used by individuals to defend themselves from accusations of racism in workplace conversations about race. *Id.* at 5 ("When a heated dialogue occurs on race, the conversation between diverse participants is typically on the content level, but the true dialogue is taking place on a less visible level (White talk vs. back talk). Common statements (content level) when White talk occurs: "My family didn't own slaves! I had nothing to do with the incarceration of Japanese Americans.").

44. Training state employees to label specific phrases of speech as "White Talk" only creates dissension in the workplace. In the prison system, it could be disastrous for safety and order.

45.     These are just a few of the multitude of examples of the racially discriminatory and abusive teachings that Mr. Young and all employees at the Colorado Department of Corrections have been subjected to. Defendants' apparent use of racially discriminatory and harassing training as a tool to promote "Equity, Diversity, and Inclusion" is patently unconstitutional, and should be enjoined by this Court.

46.     Not only were Mr. Young's own experiences severe and pervasive, but his knowledge that his colleagues were being instructed in the same manner with the same trainings exacerbated the hostile environment. The fact that his non-white colleagues were viewing the same content, and absorbing the idea that he—as a white individual—was contributing toward racism and their oppression, was too much for him. The trainings created a culture of suspicion and distrust in the Department of Corrections.

47.     Enjoining this discriminatory conduct will promote equal rights under the law for all Americans, and promote efforts to stop further racial discrimination, since "[t]he way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007) (plurality opinion by C.J. Roberts).

48.     Furthermore, Mr. Young is entitled to damages for suffering discrimination so severe and pervasive that he was forced to resign from his position.

**Mr. Young Exhausted His Administrative Remedies Prior to Bringing This Suit.**

49.     Defendants knew about the content of these training sessions, because Defendants themselves developed and chose them. Indeed, Mr. Young complained through his employer's formal complaint process, and was informed on July 7, 2021, that his complaint would not be

investigated. *See* Exhibit 8 (Administrative Denial) ("Your report did not establish reasonable cause to indicate the presence of discrimination [or] discriminatory harassment."). His employer's refusal to investigate—much less remedy—the situation, led to his decision to leave the Department of Corrections.

50.     Mr. Young has exhausted his administrative remedies, having filed a Charge of Discrimination with the EEOC on July 13, 2021. *See* Exhibit 9 (EEOC Charge).

51.     Mr. Young subsequently properly supplemented his complaint at the request of the EEOC.  *See* Exhibit 10 (EEOC Q&A).

52.     On November 19, 2021, the U.S. Department of Justice, Civil Rights Division, issued a letter informing Mr. Young of his right to institute a civil action pursuant to Title VII of the Civil Rights Act of 1964. *See* Exhibit 11 (Right to Sue Letter).

**CAUSES OF ACTION**
**FIRST CLAIM FOR RELIEF**
**(Against Defendant Colorado Department of Corrections)**

(Title VII of the Civil Rights Act of 1964 – 42 U.S.C. § 2000e-2(a)(1))
(Employment Discrimination – Hostile Work Environment)

53.     Plaintiff realleges and incorporates by reference the allegations set forth above as if fully set forth herein.

54.     To survive summary judgment on a hostile work environment claim, a plaintiff must show that under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privileges of employment; and (2) the harassment was based on the victim's ancestry or disability. *Bolden*, 43 F.3d at 551. A plaintiff must demonstrate more than a few isolated incidents of prohibited conduct, such as a steady barrage of opprobrious comments based on ancestry or disability. *Id*

55.    Defendants' racially discriminatory training materials were so pervasive and severe that they altered the terms, conditions, and privileges of Mr. Young's employment. While "an employee need not demonstrate either actual or desired termination from employment in order to maintain a hostile work environment claim," *Davis*, 142 F.3d at 1337, that is exactly what occurred here—Mr. Young felt harassed and intimidated to the point that he no longer felt comfortable working for the Department of Corrections, and ultimately resigned.

56.    Defendants knew of the harassing nature of the training materials—Defendant created and implemented the materials, and Mr. Young directly objected to their use—yet did nothing to cure the issue. Defendants' inaction thus violated Mr. Young's rights under Title VII. *See Duncan*, 397 F.3d at 1313 ("An employer must respond to a hostile work environment when the employer actually knows, or 'in the exercise of reasonable care should have known,' of the alleged harassment.") (quoting *Adler,* 144 F.3d at 673).

**SECOND CLAIM FOR RELIEF**
**(Against Defendants Dean Williams and Jill Hunsaker Ryan)**

(Fourteenth Amendment Right to Equal Protection)
(42 U.S.C. § 1983)

57.    Plaintiff realleges and incorporates by reference the allegations set forth above as if fully set forth herein.

58.    The Fourteenth Amendment to the U.S. Constitution protects Plaintiff from discrimination on the basis of his race and color.

59.    While employed at the Department of Corrections, Plaintiff was similarly situated in all relevant aspects to all other corrections officers regardless of race and color.

60.     The development and use of the training materials described above was and remains racially discriminatory. The materials classify individuals by race, treat individuals differently based on race, and instruct employees to treat each other differently based on race. The materials also demean and stigmatize Plaintiff, along with all other similarly situated individuals, based on race and skin color.

61.     Defendants' use of the training materials unlawfully discriminates against Plaintiff on the basis of an immutable characteristic.

62.     Defendants' use of racially discriminatory training materials is patently unconstitutional and should be enjoined by the Court. Enjoining this discrimination will promote equality under the law for all American citizens and promote efforts to stop further racial discrimination because "[t]he way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007) (plurality opinion by C.J. Roberts). This principle announced by the Supreme Court is completely at odds with the training materials promulgated by defendants. *See* How to be an Antiracist, by Ibram X. Kendi, mentioned *supra* ¶¶ 34-35, at 19 ("The only remedy to past discrimination is present discrimination … The only remedy to present discrimination is future discrimination.").

63.     "Race-based assignments embody stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts—their very worth as citizens—according to a criterion barred to the Government by history and the Constitution." *Miller v. Johnson*, 515 U.S. 900, 912 (1995).

64.     Facially neutral laws and policies that are motivated by discrimination "are just as abhorrent, and just as unconstitutional, as laws that expressly discriminate on the basis of race." *N. Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016).

65.     "Discriminatory purposes 'may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another.'" *Id.* (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)).

66.     Defendants' discrimination against Plaintiff and his race and color is presumptively unconstitutional, and subject to strict scrutiny.

67.     Use of the training materials was motivated by a discriminatory purpose. White individuals are uniformly stigmatized in the training materials as "racist," *supra* ¶ 34, and "privileged," *supra* ¶ 39-40, with any potential pushback preemptively described as "white fragility," *supra* ¶ 22.

68.     Use of the training materials does not satisfy strict scrutiny.

69.     Use of the training materials does not further a compelling governmental interest of Colorado or the Colorado Department of Corrections, or the Colorado Department of Public Health and Environment.

70.     Use of the training materials is not narrowly tailored to further a compelling government interest of Colorado or the Colorado Department of Corrections.

71.     Defendants have no legitimate governmental interest in furthering racial discrimination. This is particularly relevant in the prison context, where racial animus is already high, and promoting further tension between races is likely to exacerbate, rather than ameliorate, the problem.

72.     Defendants have no legitimate governmental interest in conveying to non-white individuals that they are inherently oppressed or inherently victims of discrimination. *See Fisher v. University of Texas at Austin* ("*Fisher I*"), 570 U.S. 297, 328 (2013) (Thomas, J., concurring) ("The worst forms of racial discrimination in this Nation have always been accompanied by straight-faced representations that discrimination helped minorities."); *see also Flowers v. Mississippi*, 139 S. Ct. 2228, 2242 (2019) ("Discrimination against one defendant or juror on account of race is not remedied or cured by discrimination against other defendants or jurors on account of race.").

73.     To the extent that legitimate state interests are at issue, the government can achieve those interests in a way that does not divide and discriminate against Plaintiff and other white corrections officers on the basis of race, violated Plaintiff's civil rights and equal protection of the laws as guaranteed by the Equal Protection Clause of the Fourteenth Amendment.

74.     Defendants' discrimination is unlawful.

75.     All actions taken by Defendants were taken while acting under the color of state law, statute, regulation, or custom of Colorado and had the effect of depriving Plaintiff of rights secured by the U.S. Constitution, specifically the Equal Protection Clause of the Fourteenth Amendment.

76.     All actions taken by Defendants were taken pursuant to official policies, practices, and customs.

77.     As a result of Defendants' actions, Plaintiff has suffered irreparable harm to his constitutional rights and his rights under State and Federal laws.

78.     Plaintiff has no adequate legal, administrative, or other remedy at law by which to prevent or minimize this harm.

79.     Absent injunctive and declaratory relief enjoining Defendants and their agents, officials, servants, employees, and attorneys from promulgating and disseminating racially discriminatory training materials, Plaintiff has suffered and will continue to suffer great and irreparable harm.

80.     Defendants have acted and are continuing to act "under color of state law" for purposes of federal civil rights law. 42 U.S.C. § 1983.

81.     Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to declaratory and injunctive relief.

82.     Plaintiff is entitled to a final judgment under 28 U.S.C. §§ 2201 and 2202 and the Fourteenth Amendment of the U.S. Constitution declaring that Defendants violated Plaintiff's rights under the Fourteenth Amendment of the U.S. Constitution.

## RELIEF REQUESTED

Plaintiff respectfully requests that this Court:

A.     Enter a declaratory judgment that Defendants violated 42 U.S.C. § 2000e-2(a)(1) by directly creating, and failing to cure, a racially discriminatory hostile work environment;

B.     Enter a declaratory judgment that the Department of Correction's use of racially discriminatory training materials violates Title VII of the Civil Rights Act of 1964;

C.     Enter a declaratory judgment that Defendants Williams and Hunsaker Ryan's development, dissemination, and promulgation of racially discriminatory training materials violates the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution.

D.      Enter an order permanently enjoining Defendants from continuing to utilize racially

discriminatory materials in its mandatory trainings;

E.      Reinstate Plaintiff at the Limon Correctional Facility;

F.      Award Plaintiff backpay, front pay, and emotional distress damages;

G.      Award Plaintiff such costs and attorney fees as allowed by law; and

H.      Grant Plaintiff such other and further relief as the Court deems appropriate.

## JURY DEMAND

Plaintiff requests a trial by jury on all issues and claims so triable.

DATED this 29th day of April, 2022.          Respectfully submitted,

*/s/ William E. Trachman*
William E. Trachman, CO Bar #45684
David C. McDonald, CO Bar #53709
Erin M. Erhardt, CO Bar #49360
Mountain States Legal Foundation
2596 S. Lewis Way
Lakewood, Colorado 80227
Telephone: (303) 292-2021
Facsimile: (303) 292-1980
wtrachman@mslegal.org
dmcdonad@mslegal.org
eerhardt@mslegal.org

*Attorneys for Plaintiff Joshua F. Young*