**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 22-cv-00145-NYW-KLM

JOSHUA F. YOUNG,

      Plaintiff,

v.

COLORADO DEPARTMENT OF CORRECTIONS,
DEAN WILLIAMS, and
JILL HUNSAKER RYAN,

      Defendants.

---

## ORDER ON MOTION TO DISMISS

---

This matter is before the Court on Defendants' Motion to Dismiss (the "Motion" or "Motion to Dismiss") [Doc. 18, filed May 6, 2022]. The Court has reviewed the Motion, the related briefing, and the applicable case law, and concludes that oral argument would not materially assist in the resolution of this matter. For the reasons set forth herein, the Motion to Dismiss is respectfully **GRANTED**.[1]

### BACKGROUND

The Court takes the following facts from the First Amended Complaint for Declaratory and Injunctive Relief (the "Amended Complaint") [Doc. 15] and construes them as true for the purposes of this Order.[2] Plaintiff Joshua F. Young ("Plaintiff" or "Mr. Young") previously worked

---

[1] This case was originally assigned to the Honorable Philip A. Brimmer. [Doc. 2]. The case was subsequently reassigned to the undersigned upon her appointment as a United States District Judge. [Doc. 30].

[2] A significant number of the paragraphs in the Amended Complaint consist of attorney argument and citations to legal authority, which are "not appropriate for a complaint." *Goldenhersh v. Aurora Loan Servs. LLC*, No. 10-cv-01936-WJM-BNB, 2011 WL 2473236, at *2 (D. Colo. June

for the Colorado Department of Corrections (the "CDOC"). [Doc. 15 at 1]. He alleges that the CDOC "implemented mandatory trainings that made sweeping negative generalizations regarding individuals who are white, and other gross generalizations about members of other racial demographics." [*Id.* at ¶ 4]. According to Plaintiff, the CDOC's training materials were "provided by the State of Colorado by the Colorado Department of Public Health & Environment" ("CDPHE"). [*Id.* at 2].

Mr. Young does not describe or explain the nature of the mandatory training, but alleges that the training materials "were based upon a glossary of terms stating that all whites are racist, that white individuals created the concept of race in order to justify the oppression of people of color, and that 'whiteness' and 'white supremacy' affect all 'people of color within a U.S. context.'" [*Id.* at ¶ 22]. Mr. Young highlights the following glossary definitions:

> "BIPOC": "Acronym for Black, Indigenous People, and People of Color; the term is used to acknowledge that Indigenous and Black people have been most impacted by whiteness, both historically and in the present day. This shapes the experiences of and relationship to white supremacy for all people of color within a U.S. context."

> "White Fragility": "Discomfort and defensiveness, often triggered by feelings of fear or guilt, on the part of a white person when confronted by information about racial inequality and injustice."

> "Race": "A social construct that artificially groups people by skin tone and other physical traits. The concept, which has no genetic or scientific basis, was created and used to justify social and economic oppression of people of color by white people."

---

22, 2011); *Chandler v. HK Hospitality, LLC*, No. CV 22-16 MV/KK, 2022 WL 17847658, at *4 (D.N.M. Dec. 22, 2022) ("[T]he extensive legal analysis and citations to authority in the [complaint are] unnecessary, improper, and should be removed."); Fed. R. Civ. P. 8(a)(2) (a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief"). The Court considers only the well-pleaded factual allegations contained in the Amended Complaint. *See Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994) ("The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true.").

"White Exceptionalism": "The belief held by some white allies that they are the exception to white racism even though they fail to address the implicit ways in which they perpetuate white supremacy. These individuals are often more interested in not seeming racist than actually improving the lives of people of color. This is sometimes referred to as fakequity."

[*Id.* at ¶ 24 (citations and emphasis omitted)]. Mr. Young further alleges that "Defendants' state-sanctioned training . . . implies a direct relationship between 'whiteness' and 'white supremacy,' which it contends presently affects all people of color in the United States." [*Id.* at ¶ 25].

The training included a document titled "Other Tools & Resources." [*Id.* at ¶ 29]; *see also* [Doc. 15-2].[3] Mr. Young alleges that he "felt pressure to review these [additional] materials and indeed did review many of them," and "also felt that because the mandatory trainings insufficiently explained why, for instance, his skin color caused him to be a racist or oppressor, . . . the additional materials might offer additional relevant information." [*Id.*].[4] One of the additional resources

---

[3] A district court may "consider documents attached to or referenced in the complaint if they are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1103 (10th Cir. 2017) (quotation omitted). Defendants do not dispute the authenticity of the "Other Tools & Resources" document, which Mr. Young references and relies upon in the Amended Complaint. *See* [Doc. 15 at ¶ 29]. The Court thus may consider this document in ruling on the Motion to Dismiss.

[4] Mr. Young states in the Amended Complaint that the training "included a section on 'Other Tools & Resources' that employees were to watch and read," but does not expressly allege that the materials contained in the "Other Tools & Resources" section were part of the CDOC's mandatory training. [Doc. 15 at ¶ 29 (emphasis added)]. Defendants suggest in their Motion to Dismiss that these resources were not part of the mandatory training. [Doc. 18 at 2–3]. In his Response, Mr. Young challenges Defendants' suggestion that the materials were optional as "unsupported." [Doc. 27 at 7]. However, the Court notes that Mr. Young expressly contrasts the "Other Tools & Resources" materials against the mandatory training: "[Mr. Young] held that because the mandatory trainings insufficiently explained why, for instance, his skin color caused him to be a racist or oppressor, . . . the additional materials might offer additional relevant information." [Doc. 15 at ¶ 29 (emphasis added)]. Because Mr. Young does not allege that the Other Tools & Resources materials were mandatory, and because the other allegations contained in the Amended Complaint are inconsistent with any such allegation, the Court thus does not construe the Amended Complaint to allege that the Other Tools & Resources section was a part of the mandatory training. *Cf. McKinley Med., LLC v. Medmarc Cas. Ins. Co.*, No. 11-cv-01218-CMA-KMT, 2012 WL 987821, *5 (D. Colo. Mar. 23, 2012) (a court "need not accept factual claims that are internally inconsistent.").

linked in the document was a video titled *Redlined, a Legacy of Housing Discrimination*. [*Id.* at ¶ 31; Doc. 15-2 at 1]. Plaintiff alleges that the video "accuses all white individuals of misunderstanding that whatever success they had was a result of their own merit, as opposed to the simple product of past forms of race discrimination" and "describes white individuals as having a misplaced sense of success." [Doc. 15 at ¶¶ 32–33]. The "Other Tools & Resources" page also included a list of "Books about Race and Marginalized Identities," which listed, *inter alia*, *White Fragility: Why It's So Hard for White People to Talk About Racism* by Robin DiAngelo ("*White Fragility*") and *How to be an Antiracist* by Ibram X. Kendi. [*Id.* at ¶¶ 35–36; Doc. 15-2 at 1]. Mr. Young asserts that these books "contain outright support for forms of invidious race discrimination masquerading as 'anti-racist' literature." [Doc. 15 at ¶ 35]. Mr. Young states that "[t]hese are just a few of the multitude of examples of the racially discriminatory and abusive teachings that Mr. Young and all employees at the Colorado Department of Corrections have been subjected to." [*Id.* at ¶ 45].

Mr. Young alleges that the CDOC's "trainings created a culture of suspicion and distrust in the [CDOC]." [*Id.* at ¶ 46]. He states that his "own experiences [were] severe and pervasive" and further alleges that "his knowledge that his colleagues were being instructed in the same manner with the same trainings exacerbated the hostile [work] environment." [*Id.*]. Additionally, he alleges that he felt "harassed and intimidated to the point that he no longer felt comfortable working for the [CDOC]" and he resigned from his employment with the CDOC on an unspecified date. [*Id.* at ¶ 55].

Mr. Young initiated this civil action on January 19, 2022 against the CDOC; Dean Williams, the Executive Director of the CDOC; and Jill Hunsaker Ryan, the Executive Director of

the CDPHE.  *See* [Doc. 1].[5]  On April 29, 2022, he filed his Amended Complaint.  [Doc. 15].  He raises two claims for relief: (1) a hostile work environment claim under Title VII of the Civil Rights Act of 1964 against the CDOC; and (2) a Fourteenth Amendment equal protection claim under 42 U.S.C. § 1983 against Executive Directors Williams and Hunsaker Ryan.  [*Id.* at 15–17].

On May 6, 2022, Defendants filed the instant Motion to Dismiss.  [Doc. 18].  Therein, they argue that both of Plaintiff's claims fail to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  [*Id.* at 4].  Mr. Young has since responded to the Motion, *see* [Doc. 27], and Defendants have replied.  [Doc. 29].  The Motion is thus ripe for disposition.

## LEGAL STANDARD

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In deciding a motion under Rule 12(b)(6), the Court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff."  *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)).  Nevertheless, a plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Rather, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (explaining that plausibility refers "to the scope of the allegations in a complaint," and that the allegations must be sufficient to nudge a plaintiff's claim(s) "across the line from conceivable to plausible").  The ultimate duty of the Court is to

---

[5] Plaintiff originally named the CDPHE as a defendant in this matter, [Doc. 1 at 1], but did not name the CDPHE in his Amended Complaint.  [Doc. 15 at 1].

"determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

## ANALYSIS

## I.     Hostile Work Environment

Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a)(1).  Title VII is violated when a workplace is "permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)).  A prima facie hostile work environment claim contains the following elements: (1) the plaintiff is a member of a protected group; (2) the plaintiff was subject to unwelcome harassment; (3) the harassment was based on the plaintiff's race; and (4) "the severity and pervasiveness of the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment."  *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1222 (10th Cir. 2015).[6]

Defendants argue that Plaintiff fails to allege facts satisfying the first, second, and fourth elements of a prima facie Title VII claim.  [Doc. 18 at 5].  The Court addresses these arguments in turn.

---

[6] Both Parties rely on these elements as those required to state a hostile work environment claim under Title VII.  *See* [Doc. 18 at 4–5; Doc. 27 at 4].

A.      **Membership in a Protected Group**

First, Defendants argue that because Plaintiff, as a white man, is a member of a historically advantaged group, he must "establish background circumstances that support an inference that CDOC is one of those unusual employers who discriminates against the majority."   [*Id.* at 5 (quotation omitted)].   Defendants maintain that "Plaintiff makes no such historical allegations regarding [the] CDOC," and for this reason, he has failed to adequately allege membership in a protected class.   [*Id.*].

In response, Mr. Young argues that "[t]o the extent that Tenth Circuit case law requires Mr. Young to establish background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority, such case law has been impliedly abrogated by more recent case law."   [Doc. 27 at 5].   Mr. Young relies upon two cases in support of this assertion—*Elson v. Colorado Mental Health Institute at Pueblo*, No. 09-cv-01375-MSK-CBS, 2011 WL 1103169, *5 n.6 (D. Colo., Mar. 26, 2011), and *Bostock v. Clayton County*, 140 S. Ct. 1731, 1738 (2020).

A plaintiff may establish a prima facie discrimination claim "either by direct evidence of discrimination or by following the burden-shifting framework of *McDonnell Douglas Corp. v. Green*."   *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012) (citing *McDonnell Douglas*, 411 U.S. 792 (1973)).[7]   Typically, establishing a prima facie discrimination case under *McDonnell Douglas* "raises an inference of discrimination . . . because we presume the[] acts, if

---

[7] "Under *McDonnell Douglas*, a three-step analysis requires the plaintiff first prove a prima facie case of discrimination."   *Khalik*, 671 F.3d at 1192.   If the plaintiff establishes the requisite elements of a discrimination claim, the burden shifts to the defendant to establish a legitimate, non-discriminatory reason for the challenged action.   *Id.*   Then, if and when the defendant meets this burden, the burden shifts back to the plaintiff to establish that "the plaintiff's protected status was a determinative factor in the employment decision or that the employer's explanation is pretext."   *Id.*

otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577 (1978).  A "plaintiff's membership in a historically disfavored group is . . . the predicate upon which the[se] presumptions" rest. *Livingston v. Roadway Exp., Inc.*, 802 F.2d 1250, 1251-52 (10th Cir. 1986).

But "Title VII's prohibition on discrimination protects members of both historically disfavored groups and historically favored ones." *Bradley v. Denver Health & Hosp. Auth.*, 734 F. Supp. 2d 1186, 1194 (D. Colo. 2010).  The Tenth Circuit has recognized, however, that "members of the majority group are not necessarily entitled to a presumption of discrimination afforded to members of a minority group," *Mattioda v. White*, 323 F.3d 1288, 1292 (10th Cir. 2003), and a prima facie case in this circumstance "requires a stronger showing."  *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1201 (10th Cir. 2006); *Dickerson v. Bd. of Trustees of Metro. State Univ. of Denver*, No. 19-cv-02087-WJM-SKC, 2021 WL 492483, at *6 (D. Colo. Feb. 10, 2021) ("[W]hen the plaintiff brings a reverse discrimination claim, the *prima facie* case must be adjusted to account for the plaintiff's historically favored status.").  In *Notari v. Denver Water Department*, 971 F.2d 585 (1992), the Tenth Circuit first recognized that when a plaintiff is tasked with establishing an inference of discrimination and "is a member of a historically favored group, an inference of invidious intent is warranted only when 'background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority.'"  *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1149 (10th Cir. 2008) (quoting *Notari*, 971 F.2d at 588–89); *see also Notari*, 971 F.2d at 589 (the plaintiff may, "in lieu of showing that he belongs to a protected group," establish "background circumstances" supporting an inference that the defendant discriminates against the majority).

Case 1:22-cv-00145-NYW-KLM   Document 46   Filed 02/01/23   USDC Colorado   Page 9 of 27

The Court respectfully disagrees with Mr. Young that the *Notari* line of cases has been "impliedly abrogated" by *Elson* or *Bostock*. *Elson* is a district court decision, and a district court cannot overrule or abrogate Tenth Circuit case law. *Clark v. Maurer*, 824 F.2d 565, 567 (7th Cir. 1987).[8] Additionally, in 2021, a year after the *Bostock* decision was issued, the Tenth Circuit again reiterated that "[b]ecause [the plaintiff] is male, a prima facie case [of discrimination] requires stronger proof than when the discrimination targets a female." *Ibrahim v. All. for Sustainable Energy, LLC*, 994 F.3d 1193, 1201 (10th Cir. 2021). The Tenth Circuit relied upon this same principle again just two months ago, stating that "[i]n a reverse discrimination case"—i.e., a case in which the plaintiff is a member of a historically favored group, *see Larson v. United Air Lines*, 482 F. App'x 344, 348 (10th Cir. 2012)—"a plaintiff must, in lieu of showing that he belongs to a protected group, establish background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority." *Painter v. Midwest Health, Inc.*, No. 21-3195, 2022 WL 17332734, at *3 (10th Cir. Nov. 30, 2022) (quotation and alteration marks omitted). The Tenth Circuit's continued reliance on the *Notari* standard post-*Bostock* demonstrates the continued viability of this standard, and so the Court is bound to follow this precedent. *Haynes v. Williams*, 88 F.3d 898, 900 n.4 (10th Cir. 1996).[9]

---

[8] And in any event, the *Elson* court simply questioned in dicta whether *Notari* "is uniformly applicable in every case in which a white employee asserts race discrimination or a male employee claims sex discrimination." *Elson*, 2011 WL 1103169, at *5 n.6.

[9] The Court also notes that Plaintiff cites *Bostock* for the proposition that *Bostock* "[found] in favor of plaintiffs alleging sex discrimination—one homosexual male plaintiff and one transgender [woman] plaintiff who initially presented as male at work—without applying [a] heightened pleading requirement." [Doc. 27 at 5]. The two referenced *Bostock* plaintiffs alleged discrimination "based on [their] homosexuality or transgender status." *Bostock*, 140 S. Ct. at 1737. In other words, the *Bostock* plaintiffs raised discrimination claims based on their membership in historically disadvantaged groups. *See Pedersen v. Off. of Pers. Mgmt.*, 881 F. Supp. 2d 294, 317 (D. Conn. 2012) ("The long history of discrimination against homosexuals is widely acknowledged in American jurisprudence, including United States Supreme Court jurisprudence."); *Grimm v. Gloucester Cnty. Sch. Bd.*, 302 F. Supp. 3d 730, 749 (E.D. Va. 2018)

However, courts within this District and this Circuit have suggested that the "background circumstances" requirement applies when the plaintiff seeks to rely on an inference of discrimination under the *McDonnell Douglas* framework, but that the requirement may not apply where the plaintiff can produce direct evidence of discrimination.  *See, e.g.*, *Dickerson*, 2021 WL 492483, at *6 (suggesting that, as an "[a]lternative[]" method to demonstrating background circumstances, "a plaintiff alleging reverse discrimination may establish his *prima facie* case by presenting direct evidence of discrimination"); *Slyter v. Bd. of Cnty. Comm'rs for Anderson Cnty.*, No. 11-4044-JAR, 2011 WL 6091745, at *3 (D. Kan. Dec. 7, 2011) (same); *Borandi v. All. for Sustainable Energy, LLC*, No. 13-cv-02026-RM-MJW, 2015 WL 2208089, at *8 (D. Colo. May 8, 2015) ("[I]n a reverse-discrimination claim, a plaintiff can demonstrate discrimination without reliance on the modified [*McDonnell Douglas*] analysis by presenting either direct or indirect evidence sufficient "to support a reasonable inference that but for plaintiff's status the challenged decision would not have occurred." (quotation omitted)); *see also Notari*, 971 F.2d at 590 (concluding that "a reverse discrimination plaintiff's failure to allege background circumstances [does not] necessarily compel[] a conclusion that he has failed to state a prima facie case of intentional discrimination" because he may "present direct proof of discriminatory intent").

Mr. Young does not argue in his Response that the *Notari* background circumstances requirement is inapplicable in this case, nor does he clarify whether he intends to proceed on a direct-evidence theory as opposed to using the *McDonnell Douglas* burden-shifting framework. *See* [Doc. 27 at 4–6].  It is thus unclear whether the heightened *Notari* standard applies here, and

---

("[T]here is no doubt that transgender individuals historically have been subjected to discrimination on the basis of their gender identity, including high rates of violence and discrimination in education, employment, housing, and healthcare access.").  Plaintiff does not allege that he is gay or transgender, instead alleging that he was discriminated against because he is white. *See* [Doc. 15].  The Court is not persuaded by Plaintiff's substantive reliance on *Bostock*.

the Court declines to pass on this issue.  In any event, the Court notes that while "the elements of each alleged cause of action help to determine whether Plaintiff has set forth a plausible claim," "the 12(b)(6) standard does not require that Plaintiff establish a prima facie case in [his] complaint."  *Khalik*, 671 F.3d at 1192.  Moreover, "many courts have recognized that a failure to allege sufficient 'background circumstances' about the employer, standing alone, is not relevant and not a reason for dismissal."  *Seymour v. Tonganoxie USD 464*, No. 20-2282-JWL, 2020 WL 6742791, at *2 (D. Kan. Nov. 17, 2020) (collecting cases); *see also Slyter*, 2011 WL 6091745, at *3 ("To the extent there is insufficient direct evidence of reverse discrimination, or of the requisite background circumstances under a *McDonnell Douglas* approach, that is an issue properly reserved for summary judgment.").  Because the Tenth Circuit has instructed that a failure to allege background circumstances "[does not] necessarily compel[] a conclusion that he has failed to state a prima facie case of intentional discrimination," *Notari*, 971 F.2d at 590, the Court cannot conclude that dismissal of Plaintiff's Title VII claim is warranted on his purported failure to plausibly allege the existence of background circumstances.

## B.    Severe or Pervasive Harassment

Defendants next argue that Plaintiff fails to allege that (1) he suffered workplace harassment and (2) that any such harassment was sufficiently severe or pervasive so as to amount to a hostile work environment.  [Doc. 18 at 5, 6].  The Court addresses these arguments together.  First, Defendants assert that "Plaintiff's allegations that the EDI Training[10] amounted to harassment are conclusory, and thus" are insufficient to state a claim under Rule 12(b)(6).  [*Id.* at 6].  In support, they maintain that Plaintiff "relies on a single instance which he claims constituted

---

[10] Defendants refer to the training Plaintiff participated in as Equity, Diversity, and Inclusion Training ("EDI Training").  *See* [Doc. 18 at 2].

harassment: that all CDOC employees, including Plaintiff, were required to take a computer-based EDI Training." [*Id.* at 5–6]. They assert that Plaintiff fails to allege any instances of harassing conduct, ridicule, or insult in the workplace, and the fact that Plaintiff disagreed with the training "does not make it harassment." [*Id.* at 6]. Moreover, they argue that even if Plaintiff did sufficiently allege that he experienced workplace harassment, he has not alleged that the harassment was so "severe or pervasive that it altered the terms, conditions, or privileges of his employment and made it intolerable to continue employment." [*Id.* at 6–7].

Mr. Young's response highlights the contents of the various resources referenced in the Amended Complaint. *See* [Doc. 27 at 6–9]. He insists that the CDOC's training materials "singled out white employees for insult and ridicule, and implicitly demanded that employees absorb and embrace these same insulting messages to advance in their careers." [*Id.* at 8–9]. He contends that the CDOC's training "was employer-sponsored harassment on the basis of race." [*Id.* at 10]. Furthermore, he asserts that he has sufficiently established that the harassment was severe and pervasive because he "was affected strongly enough by the training that he actually resigned from a position that he otherwise enjoyed and excelled at." [*Id.* at 12].

"An employer creates a hostile work environment when 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 851 (10th Cir. 2007). To survive a motion to dismiss, "[a] plaintiff must allege facts showing that the work environment 'is both subjectively *and* objectively hostile or abusive' under this standard." *Brown v. LaFerry's LP Gas Co.*, 708 F. App'x 518, 520 (10th Cir. 2017) (quoting *Lounds*, 812 F.3d at 1222 (emphasis in original)). "In other words, it is not enough that a particular plaintiff deems the work environment hostile; it must also be of the

character that it would be deemed hostile by a reasonable employee under the same or similar circumstances." *Lounds*, 812 F.3d at 1222.

Upon review of the Amended Complaint, the Court agrees that Mr. Young fails to allege facts sufficient to plausibly allege that he experienced workplace harassment that was so severe or pervasive so as to "alter the conditions of [his] employment and create an abusive working environment." *Hall*, 476 F.3d at 851. Mr. Young posits in the Amended Complaint that the CDOC's training "created a racially hostile environment for Mr. Young" and "the statements [in the training] and their mandatory, recurring nature indicated that the workplace is permeated with discrimination, ridicule, and insult." [Doc. 15 at ¶ 7]. But this conclusory allegation is unaccompanied by sufficient supporting factual allegations.

First, while Mr. Young alleges that the CDOC "implemented mandatory trainings" in the workplace, [*id.* at ¶ 4], he does not actually allege any specific facts describing the nature, contents, or frequency of the mandatory training, *see, e.g.*, [*id.* at ¶¶ 4, 21 (referencing "mandatory trainings" but not providing any supporting factual details of that training)], so as to plausibly support his conclusion that the mandatory training "permeated [the workplace] with discrimination, ridicule, and insult." *Davis*, 142 F.3d at 1341. At best, Mr. Young asserts that his "training materials were based upon [the] glossary of terms." [Doc. 15 at ¶ 22]. But this vague allegation does not explain how the mandatory training was "based upon" the glossary of terms or describe how or how often the glossary of terms was allegedly used in Plaintiff's mandatory training. *See generally* [*id.*]. Stated differently, Mr. Young's assertion that the CDOC's mandatory trainings "created a racially hostile environment," [*id.* at ¶ 7], are unaccompanied by supporting factual allegations.

Mr. Young's failure to allege facts plausibly establishing that the mandatory trainings – or any incidents derived from the mandatory trainings – created a hostile work environment is

compounded by his failure to specifically allege which, if any, of the ancillary challenged materials he actually reviewed, so as to plausibly allege facts supporting his hostile work environment claim. While Mr. Young spends much of his pleading describing certain materials contained in the "Other Tools & Resources" page,[11] *see* [*id.* at ¶¶ 29–33, 36, 38–41], Mr. Young's allegations fail to identify what *he himself* actually viewed as part of his training that allegedly made him feel "harassed and intimidated to the point that he no longer felt comfortable working for the [CDOC]." [*Id.* at ¶ 55]. Significantly, Mr. Young *does not* actually allege that he reviewed the materials he describes at length in the Amended Complaint: the *Redlined, a Legacy of Housing Discrimination* or *Intersectionality 101* videos, [*id.* at ¶¶ 31–33, 38], the *White Fragility* or *How to be an Antiracist* books, [*id.* at ¶ 36], the "Equity Continuum," [*id.* at ¶ 39], or the document titled "Guidance for Leaders: Engaging in Racial Discussions" on the Colorado Office of Health Equity's website. [*Id.* at ¶ 40]. Indeed, Mr. Young alleges only that he "felt pressure to review these materials and indeed did review many of them." [*Id.* at ¶ 29]. But Mr. Young does not actually identify *who* pressured him to review these materials or *which* of the materials he reviewed, so as to render it plausible that these materials contributed to his feeling "harassed and intimidated to the point that he no longer felt comfortable working for the [CDOC]." [*Id.* at ¶ 55]. Nor does he make any allegations that he understood there would be adverse consequences (either formal or informal) if he did not review the additional materials. *See generally* [*id.*].

While the Court must construe all reasonable inferences in Plaintiff's favor, it cannot assume the existence of facts not alleged. *Whitney v. New Mexico*, 113 F.3d 1170, 1173–74 (10th Cir. 1997). Mr. Young is represented by counsel and is not entitled to a liberal construction of his pleadings. *Mann v. Boatright*, 477 F.3d 1140, 1148 n.4 (10th Cir. 2007). A general description

---

[11] *See supra* n. 4.

of the materials that Plaintiff finds objectionable, without actual affirmative allegations that Plaintiff reviewed these specific materials or had knowledge of their contents prior to his resignation, or was in any way pressured to read and/or internalize them, amounts to a general challenge to the contents of the materials themselves, without any connection to the facts of this case. Given that hostile work environment claims are evaluated on a spectrum, and a plaintiff must allege facts establishing an environment so "severe or pervasive [so as] to alter the conditions of the victim's employment and create an abusive working environment," *Hall*, 476 F.3d at 851, Mr. Young's failure to inform the Court of what specific materials allegedly contributed to the hostile work environment renders his claim deficient.

Furthermore, the Court acknowledges it may "consider[] not only specific hostility targeting Plaintiff, but also the general work atmosphere." *Clay v. United Parcel Serv., Inc.*, 983 F. Supp. 2d 1331, 1342 (D. Kan. 2013) (citing *McCowan v. All Star Maint., Inc.*, 273 F.3d 917, 925 (10th Cir. 2001)). However, Mr. Young includes no specific factual allegations concerning the workplace atmosphere at the CDOC. He fails to aver facts that permit a factfinder to make determinations with respect to the frequency of such trainings, or how often the trainings, training materials, or EDI concepts were discussed in his workplace. *See generally* [Doc. 15]. Instead, he alleges only that "[t]he trainings created a culture of suspicion and distrust in the [CDOC]." [*Id.* at ¶ 14]. "A discriminatory and abusive environment must affect the employee's work environment so substantially as to make it intolerable for [him] to continue." *Creamer v. Laidlaw Transit, Inc.*, 86 F.3d 167, 170 (10th Cir. 1996). Without any factual allegations detailing how the CDOC's trainings affected Mr. Young's workplace or "created a culture of suspicion and distrust" within the CDOC, Plaintiff's allegations are insufficient to plausibly allege that the trainings

affected the workplace "so substantially as to make it intolerable" for Plaintiff to continue his employment. *Id.*

Even if the Court did find Plaintiff's allegations sufficiently specific, the Court cannot conclude that Plaintiff has adequately alleged that the alleged harassment was sufficiently severe or pervasive so as to amount to a hostile working environment.  Severity and pervasiveness "are independent and equal grounds upon which a plaintiff may establish this element of a hostile environment claim."  *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1144 (10th Cir. 2008) (quotation omitted).  They are "to a certain degree inversely related; a sufficiently severe episode may occur as rarely as once, while a relentless pattern of lesser harassment that extends over a long period of time also violates the statute."  *Id.* (quotation and alteration marks omitted).  To determine whether alleged harassment "is sufficiently severe and pervasive as to create a hostile environment, [courts] consider various factors, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Sidlo v. Millercoors, LLC*, 718 F. App'x 718, 728 (10th Cir. 2018) (quotation omitted).

As to pervasiveness, Mr. Young argues in his Response that the alleged harassment was pervasive because "the trainings were officially mandated by Plaintiff's employer."  [Doc. 27 at 10].  The Court again notes that Plaintiff has not provided the Court with any specific factual allegations actually describing the contents of the CDOC's *mandated* training; he does not specifically allege facts regarding his specific review of any of the additional materials referenced in the Amended Complaint; and he does not identify any facts that permit the factfinder to conclude that the training, or the discussion of the training materials, occurred at a frequency so as to be pervasive.  Moreover, Mr. Young cites no case law in support of his suggestion that the

pervasiveness inquiry turns on the source of the alleged harassment.  *See* [*id.*].  As discussed above, there are no factual allegations as to how frequently, or in what manner, the concepts discussed during the EDI training arose.  Generally speaking, to establish severe or pervasive harassment, a plaintiff "must show more than a few isolated incidents of enmity" or "sporadic" comments.  *Sidlo*, 718 F. App'x at 728.  "Instead, there must be a steady barrage of opprobrious racial comments." *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005) (quotation omitted).  At best, here, Plaintiff alleges that he participated in a mandatory training that was "based upon" a glossary of terms, and that the glossary of terms included terms or phrases such as "white fragility," "white supremacy," and "white exceptionalism."  [Doc. 15 at ¶ 24].  But because Plaintiff offers no factual allegations explaining how or how often these terms were used in the mandatory training or otherwise, Plaintiff fails to allege that he experienced a "steady barrage of opprobrious racial comments" plausibly supporting a hostile work environment claim.  *Chavez*, 397 F.3d at 832; *see also Enlow v. Covidien LP*, No. 13-cv-01198-WJM-MJW, 2014 WL 7437045, at *6 (D. Colo. Dec. 30, 2014) ("[L]imited incidents, even viewed in the light most favorable to Plaintiff, are insufficient to constitute a work environment 'permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of his employment.'") (quoting *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1170 (10th Cir. 2007) (alteration marks omitted).[12]

---

[12] In his Response, Mr. Young also posits that the training "was presented as an ongoing obligation to the employees, with [career] advancement impliedly conditioned upon being willing to incorporate the lessons into one's job." [Doc. 27 at 11].  But Mr. Young cites to no allegations in the Amended Complaint that support this assertion, *see* [*id.*], and the Court's independent review of the Amended Complaint revealed no such supporting allegations.  A plaintiff may not amend his pleading by asserting new allegations in a response to a motion to dismiss.  *Abdulina v. Eberl's Temp. Servs., Inc.*, 79 F. Supp. 3d 1201, 1206 (D. Colo. 2015).  The Court declines to consider these newly added allegations at length in this Order.  Nevertheless, even if the Court were to

Mr. Young also argues that the alleged harassment was severe. [Doc. 27 at 9]. "[A]n isolated incident may suffice if the conduct is severe and threatening." *Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1243 (10th Cir. 2001). But "the bar to establish a hostile work environment based on an isolated incident remains very high." *Lopez v. Brennan*, No. 2:15-cv-00595-EJF, 2018 WL 4688352, at *6 (D. Utah Sept. 28, 2018). "[C]ourts have required the conduct to be especially egregious or extreme where only isolated incidents are alleged." *Morris v. City of Colo. Springs*, 666 F.3d 654, 667 (10th Cir. 2012) (collecting cases); *see also Yousefi v. Wal-Mart Stores Inc.*, No. 2:15-cv-00135, 2016 WL 3817680, at *3 (D. Utah July 12, 2016) ("A single incident is generally insufficient to create a hostile work environment, unless it is 'extremely serious.'") (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)); *see, e.g.*, *Turnbull*, 255 F.3d at 1242 (single incident could establish hostile work environment where the plaintiff was physically attacked and sexually assaulted at work). "Most incidents found to meet this standard involve some kind of physical assault." *Brown*, 708 F. App'x at 522. The Tenth Circuit has suggested, however, that a single incident may be sufficiently severe if it involves the use of "an unambiguous racial epithet." *Lounds*, 812 F.3d at 1230.

Here, Plaintiff alleges that he participated in diversity training that was "based upon" a glossary of terms that included terms such as "white exceptionalism," "white fragility," and "white supremacy." [Doc. 15 at ¶ 24; Doc. 15-1]. "[T]he objective severity of the harassment from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Harsco Corp. v. Renner*, 475 F.3d 1179, 1187 (10th Cir. 2007). These terms are objectively not "unambiguously racial epithet[s]" that could support a conclusion that a single incident—or a

---

consider these newly added allegations, it would not change its substantive analysis as those newly added allegations do not resolve the deficiencies in the Amended Complaint identified herein.

single training—was so serious or severe so as to establish a hostile work environment. *Lounds*, 812 F.3d at 1230; *see also Wiggins v. Garden City Golf Club*, No. 17-cv-4270-AMD-SMG, 2019 WL 6716750, at *5 (E.D.N.Y. Dec. 10, 2019) ("Courts can and often do look to historical context when evaluating conduct alleged to have created a hostile work environment.").  While Plaintiff himself construes the challenged terms to imply that "all whites are racist," *see* [Doc. 15 at ¶ 22], "[t]he mere utterance of a statement which engenders offensive feelings in an employee would not affect the conditions of employment to a sufficiently significant degree to violate Title VII.'" *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1537 (10th Cir. 1995); *Lounds*, 812 F.3d at 1222 (harassment must be both subjectively and objectively severe).  The Court concludes that Plaintiff has failed to allege facts plausibly establishing a work environment that was so severe that it "alter[ed] the conditions of [his] employment and create[ed] an abusive working environment." *Hall*, 476 F.3d at 851.  *See Vitt v. City of Cincinnati*, 250 F. Supp. 2d 885, 887 (S.D. Ohio 2002), *aff'd*, 97 F. App'x 634 (6th Cir. 2004) (where the plaintiff alleged, *inter alia*, that her supervisor told her that "[a]ll white people are prejudiced, it's just subconscious with some," affirming grant of summary judgment on hostile work environment claim upon concluding that the plaintiff failed to establish prima facie elements of claim).  For these reasons, the Court concludes that Mr. Young has not stated a hostile work environment claim under Title VII.  The claim is thus **DISMISSED without prejudice** under Rule 12(b)(6) for failure to state a claim.

## II.    Equal Protection

Next, Defendants seek dismissal of Plaintiff's equal protection claim against Executive Directors Williams and Hunsaker Ryan in their official capacities under Rule 12(b)(6).  [Doc. 18 at 11].  The Equal Protection Clause of the Fourteenth Amendment guarantees that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws," U.S. Const.

amend. XIV, § 1, and "keeps governmental decision makers from treating differently persons who are in all relevant respects alike." *Soskin v. Reinertson*, 353 F.3d 1242, 1247 (10th Cir. 2004). "The Clause 'creates no substantive rights. Instead, it embodies a general rule that States must treat like cases alike but may treat unlike cases accordingly.'" *Teigen v. Renfrow*, 511 F.3d 1072, 1083 (10th Cir. 2007) (quoting *Vacco v. Quill*, 521 U.S. 793, 799 (1997)). There is no dispute that Defendants Williams and Hunsaker Ryan are sued only in their official capacities, not their individual ones. [Doc. 18 at 4 n.3; 8; Doc. 27]. Accordingly, any relief for an Equal Protection Clause violation pursuant to 42 U.S.C. § 1983 is limited to prospective injunctive or declaratory relief. *See Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1214 (10th Cir. 2019) (citing *Ex parte Young*, 209 U.S. 123 (1908)).

Defendants argue that Plaintiff fails to state an equal protection claim under Rule 12(b)(6). [Doc. 18 at 11–14]. Mr. Young responds that he has properly pleaded an equal protection claim under § 1983. [Doc. 27 at 13]. Although not raised by the Parties, this Court has an independent obligation to consider its subject matter jurisdiction. *Fort Bend Cnty. v. Davis*, 139 S. Ct. 1843, 1849 (2019) (citing *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012)). Upon review of the Amended Complaint and applicable case law, the Court concludes that Plaintiff lacks standing to assert his equal protection claim.

### A.     Constitutional Standing

Article III of the United States Constitution limits the jurisdiction of federal courts to cases or controversies. U.S. Const. art. III, § 2.; *see also WildEarth Guardians v. Pub. Serv. Co. of Colo.*, 690 F.3d 1174, 1181 (10th Cir. 2012) ("[W]ithout a live, concrete controversy, [a court] lack[s] jurisdiction to consider claims no matter how meritorious."). "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional

limitation of federal-court jurisdiction to actual cases or controversies." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976).

"[S]tanding 'is an essential and unchanging part of the case-or-controversy requirement of Article III.'" *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1153 (10th Cir. 2013) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).   Because standing "raises jurisdictional questions," the Court must consider the issue *sua sponte*.  *Rector v. City & Cnty. of Denver*, 348 F.3d 935, 942 (10th Cir. 2003); *see also New England Health Care Emps. Pension Fund v. Woodruff*, 512 F.3d 1283, 1288 (10th Cir. 2008) ("It is well established that any party, including the court *sua sponte*, can raise the issue of standing for the first time at any stage of the litigation.").

Mr. Young "bears the burden of establishing standing as of the time he brought this lawsuit and maintaining it thereafter."  *Carney v. Adams*, 141 S. Ct. 493, 499 (2020).  "To sustain this burden, a plaintiff must allege [he] has '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Santa Fe All. for Pub. Health & Safety v. City of Santa Fe*, 993 F.3d 802, 813 (10th Cir. 2021) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)).  "[A]n injury in fact must be actual or imminent, not conjectural or hypothetical," *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1155 (10th Cir. 2005), and "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan* 504 U.S. at 561 (quoting *Simon*, 426 U.S. at 38, 43).

## B.      Plaintiff's Equal Protection Claim

The Eleventh Amendment guarantees that "[s]tates may not be sued in federal court unless they consent to it in unequivocal terms or unless Congress, pursuant to a valid exercise of power, unequivocally expresses its intent to abrogate the immunity." *Muscogee (Creek) Nation v. Okla.*

*Tax Comm'n*, 611 F.3d 1222, 1227 (10th Cir. 2010). "This prohibition encompasses suits against state agencies" and "[s]uits against state officials acting in their official capacities." *Id.* Section 1983 does not abrogate a state's sovereign immunity. *Id.*; *Quern v. Jordan*, 440 U.S. 332, 338–40 (1979). However, "a plaintiff may bring suit against individual state officers acting in their official capacities if the complaint alleges an ongoing violation of federal law and the plaintiff seeks prospective relief." *Williams*, 928 F.3d at 1214 (citing *Ex parte Young*, 209 U.S. 123). The *Ex parte Young* exception applies only to claims of prospective declaratory and injunctive relief. *Hill v. Kemp*, 478 F.3d 1236, 1255 (10th Cir. 2007); *Est. of Schultz v. Brown*, 846 F. App'x 689, 692 (10th Cir. 2021).[13]

In the context of his equal protection claim, Plaintiff asserts that he "is entitled to declaratory and injunctive relief." [Doc. 15 at ¶ 81]. He requests that the Court (1) enter a declaratory judgment that the Executive Directors Williams's and Hunsaker Ryan's "development, dissemination, and promulgation of racially discriminatory training materials violates the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution" and (2) enter an order "permanently enjoining Defendants from continuing to utilize racially discriminatory materials in [their] mandatory trainings." [*Id.* at 20–21]. The Court cannot conclude that Plaintiff has standing to request either form of relief. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) ("[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek.").

---

[13] A court may, but is not required to, raise the issue of Eleventh Amendment immunity *sua sponte. See U.S. ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 942 (10th Cir. 2008). Insofar as Plaintiff requests a declaration "that Defendants *violated* Plaintiff's rights under the Fourteenth Amendment of the U.S. Constitution," [Doc. 15 at ¶ 82 (emphasis added)], this requested relief is barred by the Eleventh Amendment. *See Collins v. Daniels*, 916 F.3d 1302, 1316 (10th Cir. 2019) ("*Ex parte Young* may not be used to obtain a declaration that a state officer has violated a plaintiff's federal rights in the past.") (quotation omitted); *Est. of Schultz*, 846 F. App'x at 692 (same).

"Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974). The same is true with respect to a request for prospective declaratory relief. *See Defs. of Wildlife v. Everson*, 984 F.3d 918, 946 (10th Cir. 2020) (noting that "past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive or declaratory relief . . . if unaccompanied by any continuing, present adverse effects") (alteration marks omitted). Here, Plaintiff alleges that the individual Defendants violated his Fourteenth Amendment rights by using training materials that Plaintiff believes are discriminatory. [Doc. 15 at ¶¶ 60–62]. But Plaintiff also alleges that he has since resigned from his employment with the CDOC. [*Id.* at ¶ 48]. While Plaintiff cursorily alleges that "[a]bsent injunctive and declaratory relief enjoining Defendants . . . from promulgating and disseminating racially discriminatory training materials, Plaintiff has suffered and will continue to suffer great and irreparable harm," [*id.* at ¶ 79], Plaintiff does not allege any specific "continuing, present adverse effects" he claims to be suffering related to the training. *See generally* [*id.*].

A number of courts have concluded that where a plaintiff is no longer employed by a former employer, the plaintiff lacks standing to challenge that employer's workplace policies or conduct, as "a plaintiff who is no longer employed by the defendant" is "not likely to face future injury by that defendant," which is required to establish standing to seek prospective relief. *Robinson v. Blank*, No. 11 CIV. 2480 PAC DF, 2013 WL 2156040, at *11 (S.D.N.Y. May 20, 2013). *See, e.g.*, *Price v. Pub. Serv. Co. of Colo.*, 1 F. Supp. 2d 1216, 1223 (D. Colo. 1998) (concluding that the plaintiff lacked standing to assert sexual harassment claim against former employer because she was "no longer employed by [the defendant] and d[id] not represent a class," and so "any injunctive relief enjoining future sexual harassment would not be personal to [the plaintiff] and would not

aid her in the slightest") (quotation omitted); *Chayer v. Barbour*, 560 F. Supp. 2d 490, 493 (S.D. Miss. 2008) ("[A]s plaintiff is no longer employed by defendants, he lacks standing to seek prospective relief of any kind."); *Savage v. Gee*, 665 F.3d 732, 740–41 (6th Cir. 2012) (plaintiff who was no longer employed at university lacked standing to challenge the university's enforcement of sexual harassment policy); *Lawlor v. Metro. Water Reclamation Dist. of Greater Chicago*, No. 17-cv-117, 2018 WL 1293227, at *4 (N.D. Ill. Mar. 13, 2018) ("Plaintiffs' employment . . . was terminated.   Plaintiffs have not alleged other facts indicating that they face a real or immediate threat of future injury resulting from any alleged misconduct on the part of the State Defendants.   Thus, Plaintiffs lack standing to seek injunctive relief against the State Defendants."); *Molina v. Pa. Soc. Serv. Union*, 392 F. Supp. 3d 469, 481 (M.D. Pa. 2019) (granting motion to dismiss based on lack of standing as to claims for prospective declaratory and injunctive relief where the plaintiff was no longer employed by a defendant, even where the plaintiff "emphasize[d] the possibility that he may be instated," as any such argument was speculative at best and insufficient to establish standing); *cf. George v. Grossmont Cuyamaca Cmty. Coll. Dist. Bd. of Governors*, No. 22-cv-0424-BAS-DDL, 2022 WL 17330467, at *10 (S.D. Cal. Nov. 29, 2022) (granting motion to dismiss claims for prospective injunctive and declaratory relief challenging the employer's vaccination policy, on mootness grounds, because "[a]s a retired . . . employee, [the plaintiff was] no longer subject to that policy and she, therefore, no longer ha[d] a legally cognizable interest in whether that policy stands or falls.").

The Court is persuaded by this authority. "To seek prospective relief, the plaintiff must be suffering a continuing injury or be under a real and immediate threat of being injured in the future." *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004).  Because Plaintiff alleges that he is no longer employed by the CDOC and does not allege facts that allow this Court to conclude

that he is likely to suffer an ongoing injury or an immediate threat of future injury arising out of the state's training, he lacks standing to assert a claim for prospective injunctive or declaratory relief. *See Chayer*, 560 F. Supp. 2d at 493 ("[A]s plaintiff is no longer employed by defendants, he lacks standing to seek prospective relief of <u>any kind</u>.") (emphasis added); *Lawlor*, 2018 WL 1293227, at *4.

The Court notes that a plaintiff who seeks both prospective injunctive or declaratory relief *and* reinstatement of their employment may retain standing to challenge a former employer's policy or practice, "assuming that the policy or practice remains in force and would likely affect [the plaintiff] again, should reinstatement be awarded." *Robinson*, 2013 WL 2156040, at *12. Here, the Amended Complaint does request that the Court "[r]einstate Plaintiff at the Limon Correctional Facility." [Doc. 15 at 21]. However, this request for reinstatement, which appears to be tied to Plaintiff's now-dismissed Title VII claim,[14] is insufficient to demonstrate standing for the equal protection claim. To establish Article III standing, the plaintiff's injury must be both "fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed *by the requested relief*." *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (emphasis added). There is simply no request for reinstatement that is appropriately tied to the equal protection claim as pleaded by

---

[14] The Court reaches this conclusion for a number of reasons. First and foremost, reinstatement is an express remedy available under Title VII. *See* 42 U.S.C. 2000e–5(g). Second, in the equal protection context, "[t]he injury in fact is the denial of equal treatment." *Am. C.L. Union of New Mexico v. Santillanes*, 546 F.3d 1313, 1319 (10th Cir. 2008); *see also Doe by & through Doe v. Hunter*, 796 F. App'x 532, 538 (10th Cir. 2019). Indeed, Mr. Young alleges that the training *itself* was unlawful under the Equal Protection Clause; he does not allege that he was treated differently than others similarly situated in his voluntary separation from his employment. *See, e.g.*, [Doc. 15 at ¶¶ 61–62, 72]. In his Response, he clarified that he was relying on "a traditional understanding of the Equal Protection Clause" focused upon Defendants' promulgation of the training materials, and distinguishes his equal protection claim from his Title VII claim based on a hostile work environment. *See* [Doc. 27 at 15-16 ("Defendant[s] [are] also incorrect to state that Mr. Young's Equal Protection claim rises or falls based on the same elements as his hostile work environment claim. . . That is incorrect. The claims are separate, and are pleaded separately for a reason.")].

Plaintiff, and equally important, there is no nexus between any potential reinstatement and the relief he does seek, i.e., a declaration that the "development, dissemination, and promulgation of racially discriminatory training materials violates the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution" and (2) an order "permanently enjoining Defendants from continuing to utilize racially discriminatory materials in [their] mandatory trainings." [Doc. 15 at 20–21].

For the reasons set forth herein, the Court concludes that Plaintiff lacks standing to request prospective declaratory or injunctive relief against Defendants Williams or Hunsaker Ryan, and as a result, the Court lacks subject matter jurisdiction over the Equal Protection claim. Accordingly, Claim Two is *sua sponte* **DISMISSED without prejudice** for lack of subject matter jurisdiction. *See Rural Water Sewer & Solid Waste Mgmt. v. City of Guthrie*, 654 F.3d 1058, 1069 n.9 (10th Cir. 2011) (dismissal for lack of jurisdiction must be without prejudice).

## CONCLUSION

For the reasons set forth herein, **IT IS ORDERED** that:

(1)    Defendants' Motion to Dismiss [Doc. 18] is **GRANTED**;

(2)    Plaintiff's hostile work environment claim is **DISMISSED without prejudice** for failure to state a claim;

(3)    Plaintiff's equal protection claim is **DISMISSED without prejudice** for lack of subject matter jurisdiction; and

(4)    The Clerk of Court is **DIRECTED to TERMINATE** the case.[15]

---

[15] Plaintiff does not request leave to amend in his Response to the Motion to Dismiss and has not filed a Motion to Amend.  *See* [Doc. 27].  In the absence of a request to amend, the district court may dismiss the action, rather than *sua sponte* grant leave to amend.  *See Barnett v. Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.*, 956 F.3d 1228, 1236 (10th Cir. 2020) (citations omitted) ("When a party faces a motion to dismiss and it believes that it can overcome objections with an

DATED:  February 1, 2023                    BY THE COURT:

_____
Nina Y. Wang
United States District Judge

---

amendment to the pleading, it should seek leave to amend at that time.  Efficient adjudication of disputes requires that the party present its best effort to state a claim before the court addresses the motion to dismiss”); *Calderon v. Kan. Dep't of Soc. & Rehab. Servs*., 181 F.3d 1180, 1186 (10th Cir. 1999) (“[A] court need not grant leave to amend when a party fails to file a formal motion.”).