FILED
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**March 11, 2024**

**FOR THE TENTH CIRCUIT**

Christopher M. Wolpert
**Clerk of Court**

_____

JOSHUA F. YOUNG,

     Plaintiff - Appellant,

v.                                                                                  No. 23-1063

COLORADO DEPARTMENT OF
CORRECTIONS; DEAN WILLIAMS;
JILL HUNSAKER RYAN,

     Defendants - Appellees.

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:22-CV-00145-NYW-KLM)**

_____

William E. Trachman (Erin M. Erhardt and David C. McDonald, with him on the briefs),
Mountain States Legal Foundation, Lakewood, Colorado, for Plaintiff-Appellant.

Pawan Nelson, Colorado Department of Law, Denver, Colorado (Philip J. Weiser,
Colorado Attorney General, Leslie C. Schultze, Senior Assistant Attorney General, and
Kerry Ferrell, Assistant Attorney General, filed the brief) for Defendants-Appellees.

_____

Before **TYMKOVICH**, **MATHESON**, and **CARSON**, Circuit Judges.

_____

**TYMKOVICH**, Circuit Judge.

_____

While Joshua Young was an employee for the Colorado Department of

Corrections, he alleges that the Department implemented mandatory Equity,

Diversity, and Inclusion training that subjected him to a hostile work environment.

After resigning from the Department because of the training program, Mr. Young

sued, asserting claims under Title VII and the Equal Protection Clause.  In his

complaint, he alleged that the training program violated Title VII by creating a

hostile work environment and violated the Equal Protection Clause by promoting

race-based policies.  In particular, he alleged the training demeaned him because of

his race and promoted divisive racial and political theories that would harm his

interaction with other corrections' personnel and inmates.  At the motion-to-dismiss

stage, the district court dismissed both claims without prejudice.

Title VII was enacted to combat workplace discrimination.  Along with the

Fourteenth Amendment's Equal Protection Clause, it broadly prohibits employers

from using racial criteria in hiring, firing, and promotion decisions.  Both also

prohibit employers from allowing work conditions to be permeated with hostile racial

or sexual animus.  To the extent diversity programs generate such animus, they are

equally subject to the prohibitions of Title VII and the Fourteenth Amendment.

Although Mr. Young's complaint highlights various materials from the

Department's Equity, Diversity, and Inclusion training that he found strongly

objectionable, our case law requires more.  The training materials and any resulting

department policies must be so severe or pervasive as to both objectively and

subjectively alter the terms of employment for its employees and create an abusive

working environment.

Mr. Young's allegations in the complaint do not meet this threshold. To be sure, Mr. Young's objections to the contents of the EDI training are not unreasonable: the racial subject matter and ideological messaging in the training is troubling on many levels. As other courts have recognized, race-based training programs can create hostile workplaces when official policy is combined with ongoing stereotyping and explicit or implicit expectations of discriminatory treatment. The rhetoric of these programs sets the stage for actionable misconduct by organizations that employ them.

But Mr. Young does not allege that the training occurred more than once—let alone an ongoing presence permeating the workplace. Nor does he allege any race-based harassing conduct, ridicule, or insult from either his co-workers or his supervisors within his workplace that occurred as a result of the training. Although he alleges the explicitly race-based implications of the training could eventually compromise employment opportunities, workplace cohesion, and prison security, those allegations are too speculative at this time to meet what our case law requires.

## I.  Background

### A. Factual History[1]

Mr. Young worked for the Colorado Department of Corrections at its Limon Correctional Facility starting in 2017. Mr. Young's superior performance resulted in his promotion to Housing Sergeant in 2019 and Visiting Sergeant in 2020.

---

[1]  These facts are taken from Mr. Young's amended complaint.

Mr. Young alleges that the "Department of Corrections implemented mandatory trainings that made sweeping negative generalizations regarding individuals who are white, and other gross generalizations about members of other racial demographics." A.C. ¶ 4. He claims the trainings "paint[ed] a grim picture of the United States as a racist country permeated with discrimination." *Id.* ¶ 21. Mr. Young alleges that "[t]hese trainings forced [him] to hear and absorb statements that were facially based on race." *Id.* ¶ 7. Mr. Young considered these "sweeping generalizations about white individuals . . . not merely boorish, juvenile, or annoying comments," but indicative of a workplace "permeated with [race-based] discrimination, ridicule, and insult." *Id.*

Mr. Young does not describe the format of the mandatory training in his amended complaint, but the briefing on appeal clarifies that the EDI training consisted of several online modules that Department of Corrections employees completed on their own computers. Mr. Young alleges that the training materials for the Department of Corrections were provided by the Colorado Department of Public Health & Environment under the auspices of its Equity, Diversity, and Inclusion training.

In the amended complaint, Mr. Young alleges that the "training materials were based upon a glossary of terms stating that all whites are racist, that white individuals created the concept of race in order to justify the oppression of people of color, and that 'whiteness' and 'white supremacy' affect all 'people of color within a U.S. context.'" *Id.* ¶ 22. Mr. Young maintains that the "glossary also states that white

individuals are triggered by feelings of guilt and fear when confronted with

'information about racial inequality and injustice,'" a "phenomenon" labeled as

"white fragility" in the glossary. *Id.* ¶ 23.  The glossary bears the imprimatur of the

Colorado Department of Public Health & Environment.



App., Vol. I, 27.

Mr. Young included other defined terms from the glossary, among the

following:

> BIPOC: Acronym for Black, Indigenous People, and People of
> Color; the term is used to acknowledge that Indigenous and
> Black people have been most impacted by whiteness, both
> historically and in the present day.  This shapes the experiences
> of and relationship to white supremacy for all people of color
> within a U.S. context.

> White Fragility: Discomfort and defensiveness, often triggered
> by feelings of fear or guilt, on the part of a white person when
> confronted by information about racial inequality and injustice.

> Race:  A social construct that artificially groups people by skin
> tone and other physical traits.  The concept, which has no
> genetic or scientific basis, was created and used to justify social
> and economic oppression of people of color by white people.
>
> White Exceptionalism: The belief held by some white allies
> that they are exception to white racism even though they fail to
> address the implicit ways in which they perpetuate white
> supremacy.  These individuals are often more interested in not
> seeming racist than actually improving the lives of people of
> color.  This is sometimes referred to as fakequity.

A.C. ¶ 24 (cleaned up).  He alleges these materials, as a whole, imputed that "Mr.
Young promotes racist principles merely by dint of the color of his skin."  A.C. ¶ 26.

Mr. Young also alleges that the training "included a section on 'Other Tools &
Resources' that employees were to watch and read."  A.C. ¶ 29 (citing App., Vol. I,
42).  Mr. Young alleges he felt pressure to review these materials, and that he
reviewed many of them as a result.  *Id.*  The "Other Tools & Resources" section
provided links to additional EDI videos and a list of books about race and
marginalized identities.

One of these videos was *Redlined, A Legacy of Housing Discrimination*,
described in the section as "a video that explains Redlining more in-depth."  *Id.*  Mr.
Young alleges *Redlined* features an interviewee using the N-word, "placing it in the
voice of all individuals other than African-Americans."  *Id.* ¶ 31.  Mr. Young
describes the same video as accusing "all white individuals of misunderstanding that
whatever success they had was a result of their own merit, as opposed to the simple
product of past forms of race discrimination."  *Id.* ¶ 32. In the same vein, the video
"describes white individuals as having a misplaced sense of success."  *Id.* ¶ 33.

In the video *Intersectionality 101*, another video linked in the "Other Tools & Resources" section, Mr. Young asserts that "animated Claymation figures are used to describe how racial identities are distinct, and force individuals to have different experiences as they go through life." *Id.* ¶ 38. In a screenshot of the video Mr. Young attached to the complaint, a "white woman named Greta is contrasted with two other individuals—Jerry and Fatima—as the video literally separates them by a physical divider, and states 'Greta, on the other hand, can ignore intersectionality if she wants to—another form of privilege." *Id.*



App., Vol. I, 68.

Mr. Young characterizes two of the recommended books—*White Fragility: Why It's So Hard for White People to Talk About Racism*, by Robin DiAngelo; and *How to be an Antiracist*, by Ibram X. Kendi—as "entrench[ing] invidious racial stereotypes." *Id.* ¶ 36. Mr. Young claims these books "contain outright support for forms of invidious race discrimination masquerading as 'anti-racist' literature." *Id.* ¶ 35.

Mr. Young also alleges that the Office of Health Equity included an "Equity Continuum" document as part of the EDI training materials. *Id.* ¶ 39. Mr. Young characterizes this document and the other training material as advocating for "treating people differently on the basis of race, in contravention of state and federal law." *Id.*



App., Vol. I, 69.

Mr. Young states that "[t]hese are just a few of the multitude of examples of the racially discriminatory and abusive teachings that [he] and all employees at the Colorado Department of Corrections have been subjected to." *Id.* ¶ 45. Mr. Young claims that the Department's "trainings created a culture of suspicion and distrust in the [Department]." *Id.* ¶ 46. He alleges that his "own experiences [were] severe and pervasive" and claims that "his knowledge that his colleagues were being instructed in the same manner with the same trainings exacerbated the hostile [work]

environment." *Id.* Additionally, he alleges that he felt "harassed and intimidated to the point that he no longer felt comfortable working for the [Department]." *Id.* ¶ 55.

Mr. Young complained through the Department's formal complaint process but was informed that his complaint would not be investigated because it "did not establish reasonable cause to indicate the presence of discrimination [or] discriminatory harassment." A.C. ¶ 49. Mr. Young states that his employer's refusal to investigate or remedy the situation led him to resign from his employment with the Department of Corrections a short time after the training.

### B. *Procedural History*

Mr. Young sued the Department of Corrections and the Executive Directors of both the Department of Corrections and the Colorado Department of Public Health & Environment. He subsequently amended his complaint, alleging two claims for relief: (1) a hostile work environment claim under Title VII against the Department of Corrections; and (2) an equal protection claim under 42 U.S.C. § 1983 against the Executive Directors.

Defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). The district court dismissed the Title VII claim as failing to state a claim because Mr. Young failed to sufficiently plead the alleged harassment was severe or pervasive. The court dismissed the equal protection claim for lack of standing because Mr. Young was no longer employed by the Department of Corrections, and thus could not challenge any state policy or practice related to prospective relief. The court

dismissed both claims without prejudice and, citing Mr. Young's failure to request leave to amend, did not sua sponte grant Mr. Young leave to amend his claims.

## II.  Analysis

Mr. Young challenges three of the district court's decisions: (1) dismissal of his hostile work environment claim; (2) dismissal of his equal protection claim; and (3) the district court's failure to sua sponte grant leave to amend.  We address each argument in turn.

We review de novo a district court's grant of a motion to dismiss for failure to state a claim.  *See Herrera v. City of Espanola*, 32 F.4th 980, 991 (10th Cir. 2022). We "accept a complaint's well-pleaded allegations as true, viewing all reasonable inferences in favor of the nonmoving party, and liberally construe the pleadings." *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1136 (10th Cir. 2023).  To survive a motion to dismiss for failure to state a claim, the complaint must "allege sufficient facts to state a claim for relief plausible on its face."  *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

We similarly review de novo a dismissal for lack of Article III standing.  *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 877 (10th Cir. 2017).  And we review denials of leave to amend a complaint under the abuse-of-discretion standard.  *SCO Grp., Inc. v. Int'l Bus. Machines Corp.*, 879 F.3d 1062, 1085 (10th Cir. 2018).

### A. Hostile work environment claim

#### 1. Legal Standards

Title VII of the Civil Rights Act of 1964 prohibits "discriminat[ion] against
any individual with respect to his compensation, terms, conditions, or privileges of
employment, because of such individual's race, color, religion, sex, or national
origin." 42 U.S.C. § 2000e-2(a)(1). "Although Title VII does not explicitly mention
hostile work environment, a victim of a racially hostile work environment may
nevertheless bring a cause of action under Title VII." *Tademy v. Union Pac. Corp.*,
614 F.3d 1132, 1138 (10th Cir. 2008) (quoting *Ford v. West*, 222 F.3d 767, 775 (10th
Cir. 2000)). So, in addition to prohibiting discrete acts of discrimination, Title VII
also protects employees from racially hostile work environments. *See id.*

To state a racially hostile work environment claim under Title VII, a plaintiff
must allege: (1) membership in a protected class; (2) he was subjected to unwelcome
harassment; (3) the harassment was due to race; and (4) the harassment was so severe
or pervasive that it altered a term, condition, or privilege of his employment and
created an abusive environment. *See Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1222
(10th Cir. 2015).

Under these requirements, Title VII is violated when a workplace is
"permeated with 'discriminatory intimidation, ridicule, and insult,' that is
'sufficiently severe or pervasive to alter the conditions of the victim's employment
and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S.
17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67

(1986)). "In determining whether [a plaintiff] [has] made the requisite showing, we must consider a variety of factors, including, '[1] the frequency of the discriminatory conduct; [2] its severity; [3] whether it is physically threatening or humiliating, or a mere offensive utterance; and [4] whether it unreasonably interferes with an employee's work performance.'" *Sprague v. Thorn Ams., Inc.*, 129 F.3d 1355, 1365 (10th Cir. 1997) (quoting *Harris*, 510 U.S. at 23) (bracketed numerals added).

For harassment to be sufficiently severe or pervasive to alter the terms, conditions, or privileges of employment, the complained-of conduct must be both objectively and subjectively offensive. *Id.*; *Harris*, 510 U.S. at 21. "[I]t is not enough that a particular plaintiff deems the work environment hostile; it must also be of the character that it would be deemed hostile by a reasonable employee under the same or similar circumstances." *Lounds*, 812 F.3d at 1222.

In the context of a hostile work environment claim, a single event, if extraordinarily severe, can alter the conditions of a working environment. *See, e.g., Tademy*, 614 F.3d at 1144 (single noose incident raised issue as to racial animus); *Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1243–44 (10th Cir. 2001) (concluding plaintiff presented sufficient evidence to support a hostile work environment claim based on single incident where an inmate "knocked [the plaintiff] to the ground, undressed her and digitally penetrated her, bit and choked her, and repeatedly threatened to kill her").

"The phrase 'terms, conditions, or privileges of employment'" is interpreted to reflect a "congressional intent 'to strike at the entire spectrum of disparate treatment

of men and women' in employment[.]" *Nat'l R.R. Passenger Corp. v. Morgan*, 536

U.S. 101, 115–16 (2002) (quoting *Harris*, 510 U.S. at 21).  Conduct that alters

'terms, conditions, or privileges of employment' is not necessarily limited to

instances of economic or tangible discrimination; it also "includes requiring people to

work in a discriminatorily hostile or abusive environment." *Id*.

 With these legal principles in mind, we turn to Mr. Young's allegations.

 *2. Mr. Young's Hostile work environment claim*

 Mr. Young has plausibly alleged the first and third elements of a hostile work

environment claim:  membership in a protected class, and the harassment was due to

race.  Only the second and fourth elements of a hostile work environment claim are at

play here.  The questions are (1) whether Mr. Young sufficiently pleaded that he was

subjected to unwelcome harassment, and (2) whether he plausibly alleged that the

harassment was so severe or pervasive that it altered the terms or conditions of his

employment and created an abusive working environment.

 *Harassment*.  Mr. Young argues that incidents alleged in his amended

complaint show that he was singled out because of his race.  As described above,

taking Mr. Young's well-pleaded factual allegations as true, as we must, the incidents

alleged in his amended complaint paint an unflattering portrait of the Department of

Corrections' employee training requirements.

 Mr. Young pleads a number of factual allegations relevant to workplace

harassment, including "his knowledge that his colleagues were being instructed in the

same manner with the same trainings exacerbated the hostile environment," A.C.

¶ 46; and that he filed a formal complaint and was informed his complaint would not be investigated because it had not "establish[ed] reasonable cause to indicate the presence of discrimination [or] discriminatory harassment." *Id*. ¶ 49. He also alleges that the "mandatory trainings created a racially hostile environment" by forcing him "to hear and absorb statements that were facially based on race," with "sweeping generalizations about white individuals" which "indicated that the workplace is permeated with discrimination, ridicule, and insult." *Id.* ¶ 7. One of the recommended videos had one of the interviewees using the N-word in the context of describing discriminatory housing practices. *Id*. ¶ 31. The training advises trainees to be careful of exclusionary "white norms," *id.* ¶ 41, and critiques "white exceptionalism," *id.* ¶ 24(d), a "fakequity" belief that "white allies" are "an exception to white racism" that "perpetuates white supremacy." *Id.*

If not already at the destination, this type of race-based rhetoric is well on the way to arriving at objectively and subjectively harassing messaging. Taken seriously by managers and co-workers, the messaging could promote racial discrimination and stereotypes within the workplace. It could encourage racial preferences in hiring, firing, and promotion decisions. Moreover, employees who object to these types of messages risk being individually targeted for discriminatory treatment—especially if employers explicitly or implicitly reward discriminatory outcomes.

Nevertheless, legally actionable discriminatory harassment under our case law must also be sufficiently severe or pervasive to alter the terms of employment. We turn to that question next.

*Severe or Pervasive Hostility.*  Even assuming Mr. Young pleaded facts
sufficient to demonstrate he endured unwelcome harassment, he must still allege
facts that establish severe or pervasive hostility.

It is not enough that the plaintiff subjectively perceived the conduct to be
severe or pervasive.  We have plausible allegations of that here.  Rather, the plaintiff
must "show that a rational jury could find that the workplace is permeated with
discriminatory intimidation, ridicule, and insult." *Throupe v. Univ. of Denver*, 988
F.3d 1243, 1252 (10th Cir. 2021).  Severity and pervasiveness are assessed based on
a number of factors within the workplace: the frequency and severity of the
discriminatory conduct; whether the conduct is physically threatening or humiliating
or merely an offensive utterance; and whether the conduct unreasonably interferes
with an employee's work performance. *See Sprague v. Thorn Ams., Inc.*, 129 F.3d
1355, 1365 (10th Cir.1997).

The allegations in Mr. Young's amended complaint do not sufficiently
establish these requirements.  For example, Mr. Young claims that he was "forced to
resign from his position" because of the EDI Training.  A.C. ¶ 48.  But Mr. Young
provides no specific facts, context, or explanation for why or how he was forced to
resign.  We know Mr. Young was offended by the EDI training, and that he was upset
about the Department's response when he complained about the EDI training.  But
what we do not know is what he experienced in the workplace due to the EDI
training—particularly his interactions with supervisors and co-workers.

While Mr. Young asserts that he experienced severe and pervasive harassment, again he does not allege specific facts that demonstrate how the training related to his actual workplace experience. For example, he does not allege that the training occurred more than once, that his supervisors threatened to punish or otherwise discipline employees who failed to complete or agree with the materials, or that co-workers engaged in specific acts of insult or ridicule aimed at him because of the training. To be sure, Mr. Young contends the training could lead to safety or security concerns because of the nature of the workplace—a state prison. But at this point, his concern is speculative.[2]

To overcome these deficiencies, Mr. Young argues that the nature of the harassment—an employer's *official* policy—should guide our analysis. Mr. Young relies on two out-of-circuit cases for this proposition. First, he points to *Henry v. CorpCar Services Houston*, a case where an African-American plaintiff worked at a limousine service company staffed with predominantly African-American chauffeurs. 625 F. App'x 607, 608–09 (5th Cir. 2015). In recognition of Juneteenth—the holiday commemorating the 1865 announcement of the abolition of slavery in Texas—the plaintiff asked for time off so he could attend events and speaking engagements. The

---

[2] Perhaps an ongoing, continuing commitment from Mr. Young's supervisors to mandatory EDI trainings with content similar to the one here may evolve into a plausible hostile workplace claim. But the single training session here is not enough. And requiring government employees to either endorse a particular race-based ideological platform or risk losing their jobs could also evolve into a plausible claim of pervasive hostility—or even venture into the realm of compelled speech.

plaintiff "discussed with [the general manager] in particular the significance of Juneteenth." *Id.* at 608.

The company went on to schedule multiple safety meetings for June 18th, 19th, and 20th, and required employees to attend at least one of the meetings. The company's CEO hired a singing telegram—a white woman in a black gorilla suit—to perform at the mandatory meetings. The performer "sang, danced, touched employees, and sat in their laps." *Id.* "She did Tarzan yells and repeatedly referred in a suggestive manner to 'big black lips,' 'big black butt,' and bananas." *Id.* The performer specifically targeted the plaintiff—calling him by name and asking, "[A]re you ready for this? Here's your Juneteenth. Oh, these nice big black hairy lips. Don't you want some?" *Id.* at 609. She continued, "Oh, that nice banana in your pants. You could have worked for La Bare's. Oh, don't you want to make me scream." *Id.* During this performance, the general manager, who was also recording a video of the event on his cell phone, leaned over to the plaintiff and said, "Okay. Here's your Juneteenth." *Id.* at 608–09.

Certainly, Mr. Young is correct that the harassment the plaintiff in *Henry* faced constituted official acts of the company and thus was relevant to the court's analysis. And to be sure, the EDI training here was the official policy of the Colorado Department of Corrections. But Mr. Young does not yet allege a comparable pattern of race-based intimidation, ridicule, or insult that accompanied his employer's official acts, which characterized the situation in *Henry*.

The same is true for the other case Mr. Young cites, *Orlando v. BNP Paribas North America*, No. 14 CIV. 4102 AJP, 2015 WL 6387531, at *18 (S.D.N.Y. Oct. 22, 2015). In that case, the plaintiff—a Jewish man—alleged he was subjected to a hostile work environment when his company twice showed a Hitler-parody video at a mandatory off-site conference.[3] When the plaintiff reported his concerns to his supervisor, the supervisor "told him to 'shut the f**k up' and made an 'absolutely bone chilling threat at [the plaintiff] and [his] career.'" *Id.* at *2.

We cannot conclude that Mr. Young's situation is comparable. While Mr. Young also watched a video that he considered offensive, the similarities end there. The two fact patterns, and how their effects manifested in the workplace, are materially different.

Undoubtedly, whether certain conduct amounts to severe or pervasive harassment depends on the particular circumstances and context in which such behavior takes place. Nonetheless, two of our cases are illustrative of mistreatment that characterize a severe or pervasive racially-hostile workplace:

For example, in *Lounds v. Lincare, Inc.*, 812 F.3d 1208 (10th Cir. 2015), the plaintiff—an African–American woman—alleged racial harassment that included co-workers and the plaintiff's supervisor using the N-word, condoning lynching, use of race-based stereotypes, and other offensive racist terms. For example, one co-worker

---

[3] We note for clarity that the plaintiff's Title VII claims were time barred but the court found a hostile work environment under New York State Human Rights Law and New York City Human Rights Law. *See Orlando*, 2015 WL 6387531, at *16–18.

said during a conversation, "We need to bring back lynching because we have enough trees." *Lounds*, 812 F.3d at 1213-14. The co-worker then approached the plaintiff and said, "'I'm not trying to offend you; it's not like I said let's go down to 9th and Grove (the Black Neighborhood) and drag every black person with a noose, tie them to a truck and drag them after hanging them.'" *Id*. at 1214 (cleaned up). When the plaintiff objected, the co-worker said she was being too sensitive. *Id*. On another occasion, a different co-worker began chanting, "Boom, N***a!" upon entering the office. *Id*.

The co-workers' conduct mirrored the conduct of the plaintiff's supervisor. The plaintiff alleged that on her first day at work, her supervisor (who was also the facility manager) asked if her name was "Shaquita." *Id*. at 1213. After asking the plaintiff to introduce herself to the group, the supervisor said, "I thought your name was Shaniqua!" *Id*. At yet another company meeting, the plaintiff's supervisor instructed employees to address the company VP as "Yes Messa." *Id*. at 1214. An employee present at the meeting reported that the comment visibly offended the plaintiff and that the plaintiff "had tears in her eyes" afterward. *Id*.

Consider next *Tademy v. Union Pac. Corp.*, 614 F.3d 1132 (10th Cir. 2008). There, the plaintiff—an African-American male—alleged racial harassment consisting of the N-word and "[N-word] go home" etched into his locker on separate occasions, racist cartoons posted on company billboards, a co-worker describing a black manager as "F***ing Kunta Kinte," a manager addressing him as "boy," and most troubling, a "life-sized hangman's noose prominently suspended from a large

19

industrial wall clock." 614 F.3d at 1135–37. "The sight of the noose caused [the plaintiff] to become so nauseated that he vomited." *Id.* at 1137.

The plaintiffs in *Lounds* and *Tademy* worked in environments permeated with race-based harassment, each enduring racially-abusive conduct, ridicule, and insult from both co-workers and supervisors. The abusive working environments created in *Lounds* and *Tademy* may well be a potential outcome of the type of training Mr. Young has alleged. But at this point, Mr. Young did not plead sufficient facts showing that he experienced severe or pervasive harassment in the course of his day-to-day job; he cannot rest only on the insults he experienced on the day he completed the EDI training.[4]

---

[4] One example of a complaint involving workplace diversity training that survived a motion to dismiss is found in *De Piero v. Pa. State Univ et. al.*, No. CV 23-2281, 2024 WL 128209 (E.D. Pa. Jan. 11, 2024). In that case, the complaint alleged that the plaintiff—De Piero—had to attend several conferences and training sessions where facilitators "ascrib[ed] negative traits to white people or white teachers without exception and as flowing inevitably from their race." *Id.* at *7. Importantly, the plaintiff's complaint included "emails and interpersonal interactions" from the time period as well: (1) a colleague making a comment that "resistance to wearing masks 'is more likely to be led by white males;'" (2) an email from the Director of Diversity, Equity, and Inclusion instructing white employees at Penn State "'feel terrible;'" and (3) messages and emails from the plaintiff's supervisor encouraging him to "assure that all students see that white supremacy manifests itself in language and in writing pedagogy," and "urging him to watch a video titled 'White Teachers Are a Problem.'" *Id.* at *7. De Piero eventually resigned from his position at Penn State, citing his disagreement with its "recent emphasis on so-called 'antiracist' programming." *Id.* at *3.

Another example is found in *Diemert v. City of Seattle*, No. 2:22-CV-1640, --- F. Supp. 3d ----, 2023 WL 5530009 (W.D. Wash. Aug. 28, 2023). In that case, the plaintiff alleged that a division manager asked him, "What could a straight white male possibly offer our department?" *Id.* at *1. Then, a "Director-level employee told Diemert it was 'impossible to be racist toward 'white people.'"" *Id.* During

In sum, Mr. Young alleges no comparable actions on the part of his co-workers or supervisors at the Department of Corrections. Mr. Young was not singled out by other correctional officers for race-based opprobrium. Nor was he physically confronted by a co-worker because of his objections to the EDI training. True, the racial rhetoric contained in the Department of Public Health & Environment's online training materials echoes the racist views espoused by the co-workers and supervisors in *Lounds* and *Tademy*. But the lack of racial animus manifesting itself in Mr. Young's day-to-day *work environment* distinguishes his case from those that have ratified a racially-hostile workplace claim. In short, Mr. Young has not plausibly alleged severe or pervasive harassment that altered the terms or conditions of his employment to create an abusive work environment.

---

mandatory training, another director-level employee "repeated a similar sentiment . . . and added that all white people have privilege and are racist." *Id.* The plaintiff also faced physical aggression from his supervisor, who "'chest bumped' him, got in his face, and told [Diemert] he had white privilege and racist motives." *Id.* at *2. The plaintiff alleged he was forced to resign because the City of Seattle could no longer accommodate his request to work from home because of staffing shortages and his belief "that employees of color were given priority to telework." *Id.*

The two cases stand for roughly the same settled and sound principle, which the court in *De Piero* articulated and we endorse: merely discussing "the influence of racism on our society does not necessarily violate federal law." No. CV 23-2281, 2024 WL 128209 at *8. But "the way these conversations are carried out in the workplace matters." *Id.* "When employers talk about race—any race—with a constant drumbeat of essentialist, deterministic, and negative language, they risk liability under federal law." *Id.* (citing *McDonald v. Santa Fe Rail Transp. Co.*, 427 U.S. 273, 278-79, 286-87 (1976)).

Because Mr. Young has failed to plausibly allege the second and fourth

elements of a Title VII hostile work environment claim, we affirm the district court.

### B.  *Equal protection claim*

Mr. Young also asserted an equal protection claim that the district court

dismissed for lack of standing.

The Equal Protection Clause of the Fourteenth Amendment guarantees that

"[n]o State shall . . . deny to any person within its jurisdiction the equal protection of

the laws," U.S. Const. amend. XIV, § 1, and "keeps governmental decision makers

from treating differently persons who are in all relevant respects alike."  *Soskin v.

Reinertson*, 353 F.3d 1242, 1247 (10th Cir. 2004).  "The Clause 'creates no

substantive rights.  Instead, it embodies a general rule that States must treat like cases

alike but may treat unlike cases accordingly.'"  *Teigen v. Renfrow*, 511 F.3d 1072,

1083 (10th Cir. 2007) (quoting *Vacco v. Quill*, 521 U.S. 793, 799 (1997)).  Relief for

an Equal Protection Clause violation under 42 U.S.C. § 1983 is limited to prospective

injunctive or declaratory relief.  *See Williams v. Utah Dep't of Corr.*, 928 F.3d 1209,

1214 (10th Cir. 2019) (citing *Ex parte Young*, 209 U.S. 123 (1908)).

To satisfy Article III's standing requirement, a plaintiff must establish: (1) an

injury in fact; (2) a sufficient causal connection between the injury and the conduct

complained of; and (3) a likelihood of redressability by a favorable decision.  *Baker

v. USD 229 Blue Valley*, 979 F.3d 866, 871 (10th Cir. 2020).  For purposes of

prospective injunctive or declaratory relief, a plaintiff must allege that he is

"suffering a continuing injury or [is] under a real and immediate threat of being

injured in the future." *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir.

2004). Conjectural or hypothetical injuries, or non-impending future injuries are

insufficient. *See Brown v. Buhman*, 822 F.3d 1151, 1165 (10th Cir. 2016).

Mr. Young alleges that the individual defendants violated the Equal Protection

Clause by using training materials that "classify individuals by race, treat individuals

differently based on race, and instruct employees to treat each other differently based

on race." A.C. ¶ 60. Mr. Young requests declaratory and injunctive relief against the

two individual defendants and their state agencies to stop them from using the EDI

training materials that are based on improper racial motivations.

Mr. Young alleges that the EDI training materials are facially discriminatory.

He alleges the materials "demean and stigmatize" him and "other similarly situated

individuals, based on race and skin color." *Id.* Mr. Young further alleges that the

"[u]se of the training materials was motivated by a discriminatory purpose," with

"[w]hite individuals . . . uniformly stigmatized . . . as 'racist,' [and] 'privileged,' with

any potential pushback preemptively described as 'white fragility.'" *Id.* ¶ 67

(internal citations omitted).

The Supreme Court requires that racial classification survive strict scrutiny.

"One of the principal reasons race is treated as a forbidden classification is that it

demeans the dignity and worth of a person to be judged by ancestry instead of by his

or her own merit and essential qualities." *Students for Fair Admissions, Inc. v.

President & Fellows of Harvard Coll.*, 600 U.S. 181, 220 (2023) (quoting *Rice v.

Cayetano*, 528 U.S. 495, 517 (2000)). When a state agency treats employees "on the

basis of race, it engages in the offensive and demeaning assumption that [employees] of a particular race, because of their race, think alike." *Miller v. Johnson*, 515 U.S. 900, 911–12 (1995). So state-sanctioned training programs that import racial assumptions or promote race-based differential treatment may very well offend the Equal Protection Clause.

That said, the district court correctly dismissed Mr. Young's equal protection claim for lack of standing because Mr. Young was no longer employed by the Department of Corrections. Mr. Young asserts he has standing for prospective relief because he seeks reinstatement under his Title VII cause of action. But Mr. Young does not contend that he has standing to pursue this cause of action apart from his Title VII claim. In other words, Mr. Young's standing to pursue his equal protection claim requires he first prevail on his Title VII claim. Because he cannot do so, we analyze whether Mr. Young maintains independent standing to pursue an equal protection claim.

Mr. Young has not pleaded sufficient facts to establish Article III standing to pursue his equal protection claim in the amended complaint because he did not plead an ongoing injury that a favorable judgment will redress. Mr. Young's equal protection claim is based on the injury he purportedly suffered from having to view the EDI training. The relief he seeks is enjoining Defendants from using or promulgating the EDI training materials. But Mr. Young resigned from employment with the Department of Corrections before bringing this lawsuit, did not plead constructive discharge, and has not requested reinstatement as part of his

24

equal protection claim. Because he no longer works for the Department and he has not requested reinstatement as a remedy, any relief in the form of a change in Department policy will not redress an ongoing injury *to him*.

Mr. Young contends an employee requesting reinstatement has standing to challenge his former employer's policies. That is true in a narrow sense, but inapplicable given Mr. Young's two causes of action. The authority Mr. Young points to does not hold that a plaintiff who lacks standing for one claim can bootstrap it to another claim for which he requests reinstatement. He relies on *Robinson v. Blank* for this bootstrapping proposition, but the plaintiff there brought a *single* Title VII claim—seeking as relief *both* reinstatement to his former job *and* a change to his former employer's policy. No. 11 CIV. 2480 PAC DF, 2013 WL 2156040, at *1 (S.D.N.Y. May 20, 2013). That is markedly different from Mr. Young's complaint here: he brings one Title VII claim seeking reinstatement as relief and a *separate and distinct* equal protection claim seeking prospective relief. So "[Mr. Young] must demonstrate standing for each claim that [he] press[es]." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). But, as the district court noted, "[t]here is simply no request for reinstatement that is appropriately tied to the equal protection claim as pleaded by [Plaintiff], and equally important, there is no nexus between any potential reinstatement and the relief he does seek." Order at 25–26.

We affirm the district court's dismissal of Mr. Young's equal protection claim.

25

### C. *Leave to Amend the Complaint*

In his response to the motion to dismiss, Mr. Young did not request leave to amend his complaint. Nor did he separately move to amend. Absent a request to amend, a district court may dismiss the action rather than sua sponte granting leave to amend. *See Barnett v. Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.*, 956 F.3d 1228, 1236 (10th Cir. 2020); *see also Calderon v. Kan. Dep't of Soc. & Rehab. Servs.*, 181 F.3d 1180, 1186 (10th Cir. 1999) ("[A] court need not grant leave to amend when a party fails to file a formal motion."). We review for abuse of discretion. *See SCO Group, Inc.*, 879 F.3d at 1085.

Mr. Young contends that he was unable to request leave to amend his complaint because, if he had done so, local rules permitted the district court to reject his response brief. But we see no insurmountable obstacle. Mr. Young could have filed a prophylactic motion for leave to amend that was separate from his response brief. Alternatively, Mr. Young could have identified additional proposed allegations that would have cured the amended complaint's defects and moved the court to reconsider its dismissal order.

In its direction to the clerk of court to terminate the case, the district court noted that Mr. Young neither requested leave to amend in his briefing nor in a separate filing, thus communicating the rationale for its choice not to sua sponte grant leave to amend. Given the information it had at hand, the district court's choice not to sua sponte grant leave to amend was not an abuse of discretion.

26

### III.  Conclusion

For the reasons stated above, we affirm the district court's dismissal of Mr.

Young's claims and the denial of leave to amend.

23-1063, *Young v. Colorado Department of Corrections*

**MATHESON**, Circuit Judge, concurring:

I concur in the result. I agree that the complaint did not plausibly allege the "severe or pervasive" element of a Title VII hostile work environment claim, that Mr. Young lacks standing for his § 1983 equal protection claim, and that the district court did not err in failing to grant sua sponte leave to amend. I do not think the court otherwise needs to comment on the EDI training or the potential for future legal challenges to it or other EDI programs, nor to address whether Mr. Young plausibly alleged the first three elements of the Title VII claim. I therefore do not join those parts of the opinion as unnecessary to resolve this case.